**NATIONAL MUFFLER DEALERS ASSOCIATION, INC.,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

No. 252, Docket 77–6106.

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1977.

Decided Nov. 21, 1977.

Myron P. Gordon, New York City (Monte Engler and Hoffberg, Gordon, Rabin & Engler, New York City, of counsel), for plaintiff-appellant.

Peter C. Salerno, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Kent T. Stauffer, Patrick H. Barth, Asst. U. S. Attys., New York City, of counsel), for defendant-appellee.

Before KAUFMAN, Chief Judge, SMITH and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

In addition to its enormous complexity, the Internal Revenue Code often speaks in generalities, and its contours and boundaries are frequently left to be filled by administrative and judicial interpretation. We are called upon to add yet another detail to the Code's broad canvas in determining whether the National Muffler Dealers Association, Inc. ("Association") is qualified to take a tax exemption for the years 1971–73 as a "business league" under § 501(c)(6) of the Internal Revenue Code. We agree with the district court that the Association does not benefit an entire "line of business" as required by the treasury regulations, and, accordingly, does not merit an exemption. We therefore affirm the dismissal of the Association's complaint.

I.

The National Muffler Dealers Association was organized in 1971, under the New York Not-For-Profit Corporation Law, as a trade association of "Midas Muffler" dealers. At the time, an internal struggle was taking place within Midas International Corporation ("Midas"), the franchisor of all Midas Muffler dealers, and many of Midas's franchisees were concerned that they might suffer from the pending corporate shake-up. As a consequence of this, they formed the Association to secure themselves against the whims of a new Midas management.

Although the Association's Certificate of Incorporation described its purpose as the promotion of the best interests of muffler dealers generally, its first set of by-laws restricted membership to muffler dealers holding a valid Midas franchise. On October 23, 1972, in an apparent effort to obtain the tax benefits it now seeks, the by-laws were amended to allow any muffler fran-

chisee to join. Since its inception, however, the Association's members have apparently all been Midas Muffler franchisees. During the tax years in question, approximately 50% of all Midas dealers were members, and although, through the Association's efforts, that figure now stands at 80%, there has never been any attempt to recruit outside of the Midas chain.

The Association first attempted to deal with a specific problem, but it soon decided to extend the scope of its activities. In its endeavors, the Association sought generally to redress the inequality of bargaining power existing between its members and Midas, and has been a formidable force at the negotiating table. As a result of its dealings with Midas, franchisees now conduct their businesses under a twenty-year franchise agreement, providing, *inter alia,* that specific cause must exist to terminate a franchise and that disputes must be submitted to arbitration. The group also succeeded in persuading Midas to eliminate its requirement that customers pay a service charge when they seek to replace a guaranteed Midas Muffler. The Association, in addition, provides a number of supplemental services inuring only to the benefit of its members. For example, it sponsors insurance programs, and publishes a newsletter. And, the Association holds an annual convention at which issues of concern to Midas dealers are discussed.

## II.

In evaluating the Association's claim to tax-exempt status, our inquiry must first focus on Section 501(c)(6) of the Internal Revenue Code, which provides an exemption to

> [b]usiness leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues . . . not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

There is no challenge to the Association's non-profit status, or the disposition of its earnings. Ours is therefore the lexicogra-pher's task of deciding what is meant by a "business league", and whether the instant Association falls within that definition.

The statute itself does not provide direct guidance. Absent such an explicit directive, we have, in the past, followed the doctrine of *noscitur a sociis,* and sought to define "business leagues" by looking at the general characteristics of the organizations with which they are grouped. In *Produce Exchange Stock Clearing Ass'n v. Helvering,* 71 F.2d 142 (2d Cir. 1934), Judge Swan, joined by Judges Learned Hand and Chase, denied an exemption to a stock clearing association which merely served the convenience of its members, finding that characteristic to be one not shared by the business entities listed in the statute. This approach to statutory construction is taken by the treasury regulation enacted pursuant to this section. The regulation provides that,

> A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not engage in a regular business of a kind ordinarily carried on for profit. It is an organization *of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business* as distinguished from the performance of particular services for individual persons. Treas. Reg. § 1.501(c)(6)–1 (emphasis added).

The admittedly common characteristic of the organizations enumerated in § 501(c)(6) is that they foster well-being within a broadly-defined segment of the commercial sector. For a chamber of commerce, that sector is, of course, defined geographically; for a board of trade, a specified business or industry is often an additional defining factor. *Cf. Retailers Credit Ass'n v. Commissioner of Internal Revenue,* 90 F.2d 47 (9th Cir. 1937); Rev.Rul. 73–411, 1973–2 Cum. Bull. 180. Thus, it is the manifest intention of Congress in § 501(c)(6) to provide an exemption for organizations which promote some aspect of the general economic welfare rather than support particular private

interests. The "line of business" requirement contained in the regulations is well suited to assuring that an organization's efforts do indeed benefit a sufficiently broad segment of the business community.[1] Having thus determined that the regulation is reasonable, the limitation it imposes on the meaning of "business league" must be accorded the force of law. *Credit Bureau of Greater New York, Inc. v. Commissioner of Internal Revenue,* 162 F.2d 7 (2d Cir. 1947). *See generally Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948).

Applying the "line of business" requirement with a sensitivity to the general considerations which underlie it, we have little difficulty in concluding that the Association does not merit an exemption. First, the Association does not draw its franchisee members from a broad base. Indeed, all bear a well-defined business relationship to a single private firm—Midas International Corporation. And the Association's activities reflect its limited constituency. It has endeavored solely to serve the interests of Midas dealers in their day-to-day dealings with their franchisor. The bulk of the muffler industry, in short, is excluded.[2] To the extent that the Association is successful in improving conditions for its members, it does so partially at the expense of non-Midas dealers, who will find themselves facing stronger competition.

The Association attempts to circumvent this outcome by suggesting that its activities do ultimately benefit all muffler franchisees. Given Midas's dominant position in the muffler industry, the Association claims that franchisees of other muffler suppliers will seek and be accorded the benefits won by Midas dealers. We note, however, that Judge Pierce clearly found that the Association had failed to establish that it conferred any benefit on muffler dealers in general. And even if the Association was able to make such a showing, the industry-wide benefit would be purely incidental to the organization's primary purpose—improving conditions for Midas dealers—and thus an insufficient basis for awarding an exemption. *See, e. g., Contracting Plumbers Cooperative Restoration Corporation v. United States,* 488 F.2d 684 (2d Cir. 1973), *cert. denied,* 419 U.S. 827, 97 S.Ct. 47, 42 L.Ed.2d 52 (1974); *General Contractors' Ass'n v. United States,* 202 F.2d 633 (7th Cir. 1953).

Finally, the Association argues that since the phenomenon of franchising is relatively new, and could not have been contemplated by the legislature when the predecessor to Section 501(c)(6) was enacted in 1913, we should recognize the strong public interest franchisee organizations serve by granting them an exemption.[3] Whatever its merits, that argument is more appropriately directed to Congress. Nothing in the statute

1. To the extent that our holding is in disagreement with the Seventh Circuit's decision in *Pepsi-Cola Bottlers' Ass'n v. United States,* 369 F.2d 250 (7th Cir. 1966), we decline to follow the majority opinion in that case. There, the court granted an exemption to a franchisee association composed solely of bottlers of Pepsi-Cola, holding that the "line of business" requirement in the regulations had no support in the statute. Judge Kiley, in a dissent, relied on the doctrine of *noscitur a sociis,* and our *Produce Exchange* case, *supra,* in upholding the validity of the regulation. The Internal Revenue Service has stated that it will not follow the decision in *Pepsi-Cola,* Rev.Rul. 68–182, 1968–1 Cum.Bull. 263, noting that an organization which promotes a single brand or product is not devoted to the improvement of an entire line of business.

2. In an effort to demonstrate Midas's position in the muffler industry, the Association introduced the testimony of Robert J. Kaden, a market researcher who had conducted a study for Midas. Kaden's investigations indicated that in 18 major metropolitan markets, only approximately 21% of the male consumers had replaced their mufflers at Midas shops. Midas's substantial competitors were private garage or service stations (23%); persons who replaced their own mufflers (27%); other muffler specialists (11%); mass merchandisers (10%); and new car dealers (8%).

3. In pressing this argument, the Association notes the similarities between itself and labor unions, which are granted an exemption under § 501(c)(5). It has, however, made no claim that it is qualified for an exemption as a labor organization, and we accordingly express no opinion with regard to the relevance of that section of the Code.

empowers the courts to grant tax exemptions to organizations, however novel, which serve merely some public interest but not the broad interest. intended by Congress.

The judgment of the district court is accordingly affirmed.