ANESTHESIA SERVICE MEDICAL GROUP, INC., EMPLOYEE PROTECTIVE TRUST, SAN DIEGO TRUST & SAVINGS BANK, TRUSTEE, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ANESTHESIA SERVICE MEDICAL GROUP, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 13935–83, 13936–83.    Filed December 24, 1985.

*Raymond F. Zvetina* and *Edward L. Kane*, for the petitioners.

*M.K. Mortensen*, for the respondent.

COHEN, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Year | Deficiency |
|---|---|---|
| Anesthesia Service Medical | 1974 | $4,155 |
| Group, Inc. (ASMG) | 1976 | 1,411 |
| Docket No. 13936–83 | 1977 | 207,313 |
| | 1978 | 264,619 |
| | 1979 | 144,762 |
| Anesthesia Service Medical | 1977 | 332,602 |
| Group, Inc. Employee | 1978 | 358,606 |
| Protective Trust (trust) | 1979 | 289,720 |
| Docket No. 13935–83 | | |

By amended answer respondent determined increased deficiencies in tax of petitioner ASMG of $300 for 1978 and $27,601 for 1979. The issues for decision are as follows: (1) Whether petitioner ASMG may deduct contributions made to petitioner trust; (2) whether petitioner trust was a Voluntary Employees' Beneficiary Association; (3) whether petitioner trust is taxable as an insurance company; (4) whether petitioner trust consti-

tuted an association or a trust for tax purposes; and (5) whether petitioner trust was a grantor trust.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Anesthesia Service Medical Group, Inc. (ASMG), is a California professional corporation incorporated on April 16, 1970, and having its principal place of business in San Diego, California. ASMG maintained its books and records and filed its Federal income tax returns on the cash method of accounting and the calendar year.

Petitioner Anesthesia Service Medical Group, Inc., Employee Protective Trust (the trust) is a trust established in California on December 31, 1976. The trust maintained its books and records and filed returns (reporting an exemption from income tax under section 501(c)(9)[1]) on the accrual method of accounting and the calendar year.

ASMG's principal activity was the rendition of anesthesiology services to patients through its physician employees, primarily at eight San Diego County hospitals. ASMG recruited prospective physician employees primarily from medical schools, teaching institutions, and the military. To maintain employment with ASMG, a physician had to be accepted as a diplomate of the American Board of Anesthesiology within 78 months from the time of initial employment with ASMG.

The number of physician employees of ASMG ranged from 49 in 1974 to 56 in 1979. The number of nonphysician employees of ASMG ranged from 26 in 1974 to 34 in 1979.

After 2 years of employment with ASMG, a physician became entitled to purchase 1 share of ASMG stock. The number of outstanding shares ranged from 43 in 1974 to 52 in 1979. Outstanding shares were owned only by physician employees actively practicing anesthesiology, and no shareholder owned more than 1 share.

Various factors necessitated that ASMG maintain protection covering malpractice acts of its employees. The hospitals

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

served by ASMG and third-party health care providers, such as Aetna and Blue Cross, required that physicians carry malpractice insurance or similar financial protection. The San Diego County Greater Health Plan, a group of physicians organized in 1978 to provide health insurance to employers and their employees and of which ASMG was a member, required all members to provide malpractice protection. Under regulations promulgated by the California Board of Medical Quality Assurance, all shareholders of a professional corporation with more than three shareholders were jointly and severally liable for professional negligence claims against the corporation to the extent of $150,000 per claim or $450,000 for all claims per year, unless the corporation possessed malpractice insurance or other security in such amounts. ASMG would have been unable to employ highly qualified physicians unless it provided malpractice protection.

From the date of incorporation through 1976, ASMG purchased commercial malpractice insurance covering acts of its employees from various independent insurance companies. The annual policies purchased for 1974, 1975, and 1976 provided maximum coverage of $5 million per claim and $5 million for all claims per year. The cost to ASMG of such policies rose from $4,116 per physician employee in 1974 to $19,507 per physician in 1976. After receiving a 1977 premium quote of $23,076 per physician for a policy providing maximum coverage of $1 million per claim and $1 million for all claims, ASMG decided, based upon a non-unanimous shareholder vote, to discontinue purchasing commercial malpractice insurance and provide malpractice protection through the trust.

ASMG established the trust on December 31, 1976. The declaration of trust, executed by San Diego Trust & Savings Bank, as trustee (trustee), and ASMG, as trustor, directed trustee to pay, for the benefit of ASMG's employees (not limited to physicians)—

amounts certified for payment in accordance with Trustor's employment contract by a claims committee appointed by the Board of Directors of Trustor, for liability for claims of medical malpractice which relate to a liability imposed on such beneficiary by law for damages arising out of the performance by such beneficiary of professional services rendered or which should have been rendered during the time such person was an Employee of Trustor * * *. Certification by the Claims Committee shall be conclusive as

to the eligibility of the claim for payment and the Trustee shall have no liability because of any payment made in accordance with such certification.

\*     \*     \*     \*     \*     \*     \*

The limits of the payments from the Trust for one claim shall be One Million Dollars ($1,000,000.00) and said amount shall be the total limit of the payments for all damages exclusive of costs of defense and supplemental payments, arising out of the rendering or failing to render professional services upon which the claim is based, regardless of the number of persons who sustain damages, the number of claims reported or suits filed on account of such damages, or the number of Employees or beneficiaries involved or alleged to be involved therein. \* \* \*

\*     \*     \*     \*     \*     \*     \*

If the covered beneficiary has valid and collectible insurance coverage as to any claim or suit to which this Paragraph A applies, the payment to be made under this Paragraph shall not apply unless and until the limits of liability of such insurance have been exhausted, and then only in an amount necessary to make the total coverage including the insurance, equal to the sum of One Million Dollars ($1,000,000.00).

Under the declaration of trust, ASMG's board of directors could direct trustee to purchase a commercial malpractice policy instead of paying the above amounts.

The declaration of trust directed trustee to invest trust assets in "eligible securities" as defined in section 16430 of the California Government Code. Although the trust instrument gave trustee the power to "manage, control, sell, and exchange" trust assets, trustee was not to invest in eligible securities the income from which was subject to Federal income tax, without prior approval of an investment committee appointed by ASMG.

ASMG retained the power to amend the terms of the trust, including replacement of trustee and termination of the trust. Under no circumstances, however, could trust assets be distributed to or for the benefit of ASMG or its employees, except for the payment of malpractice claims or the purchase of malpractice insurance. Upon termination of the trust, trust assets would be distributed to tax-exempt corporations qualifying under section 501(c)(3) and selected by ASMG's board of directors.

The employment contract between ASMG and its employee physicians for 1977, referred to in the declaration of trust and

executed on December 31, 1976, provided that each physician would work exclusively for ASMG and that all accounts receivable for professional services rendered by the physician would be the property of ASMG. Under the contract, ASMG agreed to pay each physician compensation equal to a percentage of the excess of the monthly collections on accounts receivable generated by the physician over $1,296. The percentage was 71.3 percent until the physician's compensation exceeded the maximum amount upon which contributions could be made under ASMG's retirement plans and 89.1 percent thereafter. No compensation was payable to the physician, however, when the balance of the accounts receivable attributable to him was less than $20,000.

The employment contract also stated:

Employer [ASMG] has established and agrees to maintain for the benefit of its Employees, a trust to pay on behalf of the Employee, claims of medical malpractice * * *

* * * subject to the one million dollar limitation * * * and only to the extent of funds available, Employer shall provide through a trust agreement for the payment on behalf of the Employee amounts for liability for claims of medical malpractice * * *

After describing the terms of payment contained in the declaration of trust, the contract further provided:

Employer and [physician] Employee recognize that it is not possible to predict or guarantee the sufficiency of any fund or trust to cover the cost of claims of medical malpractice arising during any particular period, and that the Employer's ability to pay compensation to Employee will be affected by Employer's obligation to make contributions to the Trust. The parties hereto, the Employer and each Employee, therefore agrée as follows:

(1) The accounting of the Trust established by Employer shall be on a separate fiscal year basis, beginning with the Trust's Fiscal Year 1977. The funds accumulated for that year, less any ultimate tax cost to Employer of providing the funds in trust, plus the income on the funds as accumulated, less any tax on such income, shall be used to pay the costs (including administrative, defense, settlement, and payment of claims) of the claims covered by this Paragraph 15 which arose out of incidents occurring during that fiscal year. To the extent that such funds are more than sufficient to cover the final costs of claims because of events occurring during that year, the balance of the funds will be carried forward and credited to the next year, and the same process shall be repeated for each succeeding fiscal year. To the extent that the funds for any fiscal year are insufficient to cover the cost of claims because of events occurring during any year, the insufficiency shall be made up as set forth below.

(2) In the event of an insufficiency of the funds for any fiscal year to cover the cost of malpractice claims arising out of events occurring during that year, as determined by Employer from time to time, the compensation of each Employee who was employed during that fiscal year shall be adjusted by an amount not to exceed the Employee's gross compensation from Employer for the fiscal year involved, determined as provided below, and Employee shall be obligated to repay to Employer the amount of the adjustment in compensation.

(3) The amount of the adjustment to compensation for the Employee for the fiscal year shall be determined by the Board of Directors by dividing the total amount required for that fiscal year by the total number of anesthesiologist Employees who were employed at any time during that year. * * *

(4) The amount of the adjustment shall be due thirty (30) days from the date of mailing of written notice from the Board to the Employee. The amount of any such adjustment shall be a personal obligation of Employee * * *

An amendment to the employment contract, executed on February 3, 1977, limited the payments from the trust for all claims against any one physician to $2 million for the year.

ASMG's board of directors dictated the amount of contributions that ASMG made to the trust. At the direction of the board, ASMG made monthly contributions totaling $10,000 per physician employee in both 1977 and 1978. In early 1977, ASMG borrowed $450,000 from a bank to purchase a certificate of deposit in that amount. ASMG used such certificate as security to avoid the joint and several liability of its shareholders under the regulation of the California Board of Medical Quality Assurance. By the end of 1977, the trust possessed sufficient assets for such security. ASMG thereupon redeemed the certificate of deposit and repaid the loan. In late 1978, the board decided to continue the $10,000 annual contribution per physician but to limit the cumulative contribution to $25,000 per physician. Aggregate annual contributions from ASMG to the trust and yearend values of trust assets were as follows:

| Year | Contributions | Trust assets |
|------|---------------|--------------|
| 1977 | $498,609 | $504,966 |
| 1978 | 532,497 | 972,258 |
| 1979 | 328,916 | 1,231,433 |

In early 1977, the board of directors appointed the claims and investment committees created under the declaration of trust. The board selected its president (referred to elsewhere as the president of the corporation), the chairman of the invest-

ment advisory committee, ASMG's business administrator, and an independent attorney as the investment committee. The board selected its president, the chairman of the professional standards and review committee, an employee of trustee, and an independent attorney as the claims committee.

After establishment of the trust, each potential malpractice claim against an employee was referred to the claims committee. The claims committee, with the assistance of legal counsel and the acquiescence of the implicated employee, ultimately decided either to approve payment of the claim or to litigate the claim. ASMG paid all approved claims and submitted monthly statements detailing such claims to trustee. Trustee then reimbursed ASMG for such payments from trust funds. The trust was not licensed as an insurance company by the State of California.

During each of the years in issue, ASMG paid aggregate expenses slightly less than its gross income. Compensation and other benefits to employees, including physician employees who were also shareholders, constituted the majority of such expenses.

From 1976 through 1979, ASMG's total assets ranged between $1,072,542 in 1976 and $594,114 in 1978. The assets held by the trust were never reflected in ASMG's financial statements; with one immaterial exception, nor were trust assets ever considered in calculating the purchase or redemption price of ASMG shares, which was based upon ASMG's net asset value.

On its Federal income tax returns for 1977, 1978, and 1979, ASMG deducted as malpractice insurance expense the contributions to the trust.

The trust filed returns for 1977, 1978, and 1979 claiming an exemption from Federal income tax under section 501(c)(9). The trust paid no Federal income tax on the contributions from ASMG or on income from trust assets.

In the statutory notice of deficiency sent to ASMG, respondent determined that the amounts deducted by ASMG as malpractice insurance were not paid for ordinary and necessary business purposes. In the statutory notice of deficiency sent to the trust, respondent determined that the trust received taxable income in the forms of malpractice premium payments from ASMG and interest income. In his amended

answer, respondent alleged that the trust was a grantor trust and that interest income received by the trust was therefore taxable to ASMG.

## OPINION

Before 1977 petitioner ASMG, a medical professional corporation, purchased commercial insurance for malpractice claims arising from the acts of its employees. On December 31, 1976, ASMG established petitioner trust and thereafter contributed funds to the trust instead of purchasing commercial insurance. We must determine the proper tax treatment to ASMG and to the trust of the post-1976 arrangement.

### 1. Deductibility of the Contributions

Petitioners advance three arguments in support of the deductibility of the contributions by ASMG. Consistent with the position taken by ASMG on its tax returns, petitioners argue that the contributions constituted "malpractice insurance premiums." Petitioners alternatively assert that the contributions were deductible as payments to an employee benefit plan under section 1.162–10, Income Tax Regs. Finally, petitioners argue that the contributions were, in any event, "ordinary and necessary" business expenses within the meaning of section 162(a).

### Insurance

Payments of insurance premiums are deductible from gross income under section 162, if the expenses are ordinary and necessary in the taxpayer's trade or business. Sec. 1.162-1(a), Income Tax Regs. Expenditures are deductible as insurance expenses, however, only if a true insurance arrangement exists. *Clougherty Packing Co. v. Commissioner,* 84 T.C. 948 (1985); *Carnation Co. v. Commissioner,* 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981). An insurance arrangement, in turn, necessarily involves both the shifting and the distributing of risk. *Helvering v. LeGierse,* 312 U.S. 531, 539–540 (1941); *Commissioner v. Treganowan,* 183 F.2d 288, 290 (2d Cir. 1950); *Tighe v. Commissioner,* 33 T.C. 557, 564 (1959).

Risk shifting emphasizes the individual aspect of insurance: the effecting of a contract between the insurer and insured each of whom gamble on the time the * * * [loss] will * * * [occur]. Risk distribution, on the other hand, emphasizes the broader, social aspect of insurance as a method of dispelling the danger of a potential loss by spreading its cost throughout a group. By diffusing the risks through a mass of separate risk shifting contracts, the insurer casts his lot with the law of averages. * * * [Commissioner v. Treganowan, 183 F.2d at 291.]

Thus, there can exist no risk distribution without risk shifting. Because the arrangement between ASMG and the trust (which was not a licensed insurance company) did not accomplish real risk shifting, ASMG may not deduct the contributions to the trust as insurance premiums.

Petitioners argue that risk shifting occurred because—

by its payments to the TRUST, ASMG has shifted to the TRUST its historically assumed obligation to provide malpractice protection for its employees. These employees, the sole beneficiaries of the TRUST, must correspondingly look solely to the TRUST for satisfaction of their responsibilities and liabilities to patients. In fact, as the evidence shows, patient claims have been, and will continue to be, satisfied from the TRUST.

Petitioners' argument ignores that, regardless of the extent of malpractice liability sustained by ASMG or its employees, the sole source of trust payments in satisfaction of such liability would be the contributions from ASMG (plus any income generated by the contributed funds). Under the declaration of trust and the amended employment contract, the trust would pay annual malpractice claims of up to $1 million per claim and $2 million per employee. During each of the years in issue, however, the trust's potential liability for payments far exceeded its funds. If actual claims in any year exceeded trust funds, ASMG would make additional contributions to the trust, to the extent of ASMG's available assets. Although the employment contract provided for the pro rata assessment against physician employees (to the extent of gross compensation), ASMG would be the entity making the additional contributions to the trust in the event of an insufficiency in trust assets. ASMG historically paid compensation to its physicians to the extent of available earnings, and the assessment provision merely allowed ASMG to determine physician compensation on a retrospective basis, i.e., taking into account actual claims experience. Petitioners' expert witness testified that trust

funding was actuarially adequate during each of the years in issue. The fact remains, however, that ASMG would make additional contributions to the trust if actual claims were higher than actuarial assumptions.

Thus, like the taxpayer in *Carnation Co. v. Commissioner, supra,* ASMG has not shifted the risk of loss under the standard articulated in *Helvering v. LeGierse, supra,* and *Commissioner v. Treganowan, supra.* The taxpayer in *Carnation* attempted to deduct as casualty insurance premiums amounts paid to American Home, an independent insurance company, which reinsured 90 percent of the risk with Three Flowers, the taxpayer's wholly owned subsidiary. American Home agreed to the reinsurance arrangement only on the condition that Three Flowers, which the taxpayer initially capitalized with $120,000, have access upon demand to total capital contributions of $3 million from the taxpayer. Relying on *LeGierse,* we denied the taxpayer deductions for the premiums relating to the insurance risk that was assumed by Three Flowers. We reasoned as follows:

> In the event of a covered casualty, the loss suffered by Carnation ultimately would be borne 90 percent by Three Flowers and 10 percent by American Home. The agreement to purchase additional shares of Three Flowers by Carnation bound Carnation to an investment risk that was directly tied to the loss payment fortunes of Three Flowers, which in turn were wholly contingent upon the amount of property loss suffered by Carnation. The agreement by Three Flowers to "reinsure" Carnation's risks and the agreement by Carnation to capitalize Three Flowers up to $3 million on demand counteracted each other. Taken together, these two agreements are void of insurance risk. As was stated by the Court in *LeGierse,* "in this combination the one neutralizes the risk customarily inherent in the other." 312 U.S. at 541. [71 T.C. at 409.]

ASMG's agreement to make additional contributions to the trust is functionally equivalent to the agreement of the taxpayer in *Carnation* to make additional capital contributions to its subsidiary.

We stated in *Clougherty Packing Co. v. Commissioner,* 84 T.C. 948, 956 (1985), that the additional contribution agreement in *Carnation* was not essential to the result. "The test continues to be whether, considering all of the facts, the risk of loss was shifted away from the taxpayer who seeks to deduct insurance premiums." 84 T.C. at 957. We thus reached the same result as in *Carnation* despite the absence of an addition-

al contribution agreement, based upon the parent and (second tier) subsidiary relationship between the taxpayer and the entity ultimately assuming the purported insurance risk. This does not mean, however, that the result in *Carnation* would have been different if the taxpayer and Three Flowers had been independent parties. Indeed, as we stated in *Carnation*, "The foregoing analysis of *LeGierse* reveals that the Court considered together two related agreements between *unrelated* parties." 71 T.C. at 408 (emphasis supplied). Although petitioners argue that *Clougherty Packing* and other "captive insurance company" cases[2] are inapplicable to their situation because ASMG did not possess the same dominion and control over the trust as a parent possesses over its subsidiary, the correctness of this factual assumption is in doubt and irrelevant. The contributory arrangement between ASMG and the trust alone indicates that risk of loss did not shift from ASMG to the trust.

In their reply brief, petitioners argue that the trust arrangement shifted risk from ASMG's employees to the trust:

The whole purpose of the Trust was to assume the lion's share of the potential for malpractice liability of the employees of ASMG. * * * Thus, risk-shifting, from the primarily responsible employees to the Trust, has indisputably occurred.

Implicit in petitioners' argument is the conclusion that, but for the trust arrangement, the risk of loss from malpractice claims rested upon ASMG's employees, not ASMG itself. This conclusion simply is not true. Petitioners admit that under the doctrine of respondeat superior, ASMG was vicariously liable for the negligent acts of its employees. Because an employer has a right of indemnification against a negligent employee, the liability of the employer is secondary to that of the employee. See Cal. Lab. Code sec. 2865 (West 1971). But secondary liability is not the same as no liability. Under respondeat superior, a malpractice claimant could seek and receive full payment solely from ASMG. See Cal. Civ. Code sec. 2338 (West 1985). Indeed, in light of ASMG's substantial assets,

---

[2]See *Stearns-Roger Corp. v. United States*, 774 F.2d 414 (10th Cir. 1985); *Beech Aircraft Corp. v. United States*, an unreported case (D. Kan. 1984, 54 AFTR 2d 84–6173, 84–2 USTC par. 9803); *Mobil Oil Corp. v. United States*, 8 Cl. Ct. 555 (1985); cf. *Crawford Fitting Co. v. United States*, 606 F. Supp. 136 (N.D. Ohio 1985).

including the monthly accounts receivable generated by its physicians, ASMG might represent the "deeper pocket." In that event, the inability of the negligent employee to reimburse ASMG would represent a potential loss, perhaps large enough to destroy ASMG. ASMG, the entity providing medical services to hospitals, could act only through its agents. Thus, for malpractice liability purposes, the protection of ASMG's employees cannot be separated from the protection of ASMG.[3]

Arguably, independent physicians, i.e., physicians not subject to common control of an employer, who establish an arrangement similar to that between ASMG and the trust might shift the risk of loss and thus create an "insurance" contract. See *United States v. Weber Paper Co.*, 320 F.2d 199 (8th Cir. 1963); the Commissioner's position in Rev. Rul. 83–172, 1983–2 C.B. 107, Rev. Rul. 80–120, 1980–1 C.B. 41, and Rev. Rul. 78–338, 1978–2 C.B. 107. That situation is not before us, however. The shareholders of ASMG, who formed the corporation and associated for business, undoubtedly took advantage of the substantial tax and other benefits available to professional corporations. They voluntarily chose to associate and they had a bona fide reason to establish the trust. But the reasonableness of their actions does not guarantee tax benefits. They cannot ignore the entity that they created or the tax disadvantages associated with it. Cf. *United States v. Basye*, 410 U.S. 441, 456 (1973); *Strong v. Commissioner*, 66 T.C. 12, 26 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977). This is not merely a matter of form versus substance. Formalities here reflect genuine differences in the legal relationships involved: ASMG's relationship to the trust is not the equivalent of ASMG's relationship to a commercial insurer. That one may be a functional substitute for the other does not control.

## *Employee Benefit Plan*

Section 1.162–10(a), Income Tax Regs., provides:

Sec. 1.162–10. Certain employee benefits.

(a) *In general.* Amounts paid or accrued by a taxpayer on account of injuries received by employees and lump-sum amounts paid or accrued as

---

[3]See *Humana Inc. v. Commissioner*, T.C. Memo. 1985–426.

compensation for injuries are proper deductions as ordinary and necessary expenses. Such deductions are limited to the amount not compensated for by insurance or otherwise. Amounts paid or accrued within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. However, except as provided in paragraph (b) of this section, such amounts shall not be deductible under section 162(a) if, under any circumstances, they may be used to provide benefits under a stock bonus, pension, annuity, profit-sharing, or other deferred compensation plan of the type referred to in section 404(a). In such an event, the extent to which these amounts are deductible from gross income shall be governed by the provisions of section 404 and the regulations issued thereunder.

Petitioners contend that the trust constitutes a "welfare or similar benefit plan" within the meaning of the above regulation and thus that ASMG may deduct contributions to the trust when made.

The regulation does not prescribe an exclusive list of benefit plans. Thus in *Greensboro Pathology Associates v. United States*, 698 F.2d 1196 (Fed. Cir. 1982), relied upon by petitioners, the Court of Appeals for the Federal Circuit held that an educational benefit plan for employees' children constituted a welfare or similar benefit plan. The court stated that the relevant inquiry was whether the plan was "one concerned with the well-being of the employees." 698 F.2d at 1200.[4]

The Court in *Greensboro Pathology* distinguished *Citrus Orthopedic Medical Group v. Commissioner*, 72 T.C. 461 (1979), in which we held that the employer had retained such extensive authority over the plan that the benefits purportedly conferred upon the employees were illusory. After noting that the plan in *Greensboro Pathology* was administered by an independent trustee and that the taxpayer retained no day-to-day control over trust funds, the Court of Appeals stated:

We realize the appellant could at any time terminate or alter the plan although the monies of the trust could never revert to or inure to the appellant's benefit. This minimal retention of control is not sufficient to make the benefits of the plan in any way illusory. Employers need to retain rights to alter or terminate plans to meet the changing needs of the

---

[4]The primary issue in *Greensboro Pathology Associates v. United States*, 698 F.2d 1196 (Fed. Cir. 1982), was whether the plan was a plan of deferred compensation and thus subject to sec. 404. See *Grant-Jacoby, Inc. v. Commissioner*, 73 T.C. 700 (1980). Respondent does not raise that issue herein.

employees and employer. This flexibility may be required with numerous types of plans including the medical, vacation and other welfare benefit plans specified by regulation. *We hold that the critical inquiry is whether the funds in the plan may ever revert to or inure to the benefit of the company. [Greensboro Pathology Associates v. United States, 698 F.2d at 1203 n.6. Emphasis supplied.]*

In *Citrus Orthopedic*, the employer retained control over and responsibility for the investment and distribution of plan assets, could amend or terminate the plan at any time, and could require the return of all contributed funds. We therefore held that amounts contributed to the plan were not "paid or incurred" within the meaning of section 162(a). 72 T.C. at 467. In the present case, ASMG had control over the distribution of trust funds, i.e., ASMG had sole power to direct the payment of particular claims and to compel the purchase of commercial insurance. Trustee could not purchase taxable securities without the consent of ASMG, and ASMG retained the power to amend or terminate the trust. On termination, ASMG could direct distribution of the assets, although not to itself. The present case is distinguishable from *Citrus Orthopedic*, however, in that distributions were limited to the payment of malpractice claims and the purchase of malpractice insurance. Thus, unlike the employer in *Citrus Orthopedic*, ASMG could not recover directly its contributions to the trust.

We nevertheless conclude that the "critical inquiry" articulated in *Greensboro Pathology* whether the funds in the plan may ever revert to or inure to the benefit of the employer is integrally related to whether the plan is a welfare or similar benefit plan, i.e., one concerned with the well-being of the employees. To the extent that plan benefits may inure to the employer, the plan is concerned with the well-being of the employer, not of the employees.

As discussed above in connection with the insurance issue, the payment of malpractice claims from trust funds will discharge ASMG's liability to the claimants. Similarly, the purchase of commercial insurance with trust funds will protect ASMG from such liability. Thus, although the declaration of trust characterized the employees as the trust beneficiaries, trust funds may inure to the benefit of ASMG.

Trust distributions also benefit ASMG's employees, in satisfying or protecting loss from their liability on malpractice

claims. The circumstances surrounding the creation of the trust nevertheless indicate that another purpose of the arrangement, at least equal in importance, was to benefit ASMG, the employer and provider of services. Establishment of the trust satisfied the security requirements of the California Board of Medical Quality Assurance and thereby insulated the *shareholders* of ASMG from joint and several liability. In justifying the amount of the annual contributions to the trust, ASMG's business administrator testified that "It would satisfy two requirements: one, our needs should there be a claim against Anesthesia Service and, two, afford us the security required by the Board of Medical Quality Assurance." Similarly, while providing comparable benefit for the physician employees, the trust arrangement allowed *ASMG* to continue *its* relationships with the hospitals *it* served, third-party health care providers, and the San Diego County Greater Health Plan, an organization to which ASMG belonged.

Malpractice liability plans are not specifically listed in section 1.162–10, Income Tax Regs. Based upon the entire record, we conclude that the trust was in substantial part and directly for the benefit of the employer, ASMG, and hence was not an employee "welfare or similar benefit plan."

### Business Expenses

Petitioners further assert that, even if the contributions to the trust did not constitute insurance, the contributions were nevertheless deductible under "the general sweep of section 162." They contend that payments for malpractice protection were "ordinary and necessary" in ASMG's business.

Petitioners' argument attempts to circumvent the rule that expenditures are deductible as insurance premiums only if an insurance arrangement exists.[5] Indeed, our entire analysis of the insurance issue was predicated upon the assumption that the contributions were otherwise ordinary and necessary within the meaning of section 162(a). We do not doubt that the payment of either insurance premiums or actual malpractice claims by ASMG would be deductible under the statute. But the contributions to the trust were neither. They were instead equivalent to funds set aside for a future contingency, i.e., a

---

[5]See *Humana Inc. v. Commissioner*, T.C. Memo. 1985–426.

reserve. Petitioners' argument would both eviscerate the insurance requirement and allow any cash basis taxpayer to obtain an immediate deduction for expenses to be paid in the future simply by transferring funds in trust. This latter effect is particularly inappropriate in the present case, where ASMG controlled the timing and amount of both the contributions to the trust and the payment of claims or insurance premiums by the trust.[6]

Our holding is unaffected by the dramatic rise in commercial insurance rates, which prompted ASMG to establish the trust, or the obvious necessity of providing malpractice protection. The difficulty, or even impossibility, of obtaining commercial insurance is irrelevant to the issue before us. See *Stearns-Roger Corp. v. United States*, 774 F.2d 414 (10th Cir. 1985); *Clougherty Packing Co. v. Commissioner*, 84 T.C. 948, 958 (1985).

## 2. Taxation of Trust Income

Respondent indicated at trial that his determination that the trust was taxable on the contributions received from ASMG was alternative to his position with respect to the deductibility of the contributions by ASMG. Because we have upheld respondent's determination on the deductibility issue, the remaining issue is the taxation of the interest income generated by trust funds. Petitioners assert that the trust was a tax-exempt Voluntary Employees' Beneficiary Association (VEBA) or, alternatively, was taxable as an insurance company or an association. Respondent disputes these assertions and argues that the trust was a grantor trust, whose income is therefore taxable to ASMG.

## VEBA Status

The organizations described in section 501(c), which are exempt from tax under section 501(a), include—

---

[6]Cf. *Poirier & McLane Corp. v. Commissioner*, 547 F.2d 161 (2d Cir. 1976), revg. 63 T.C. 570 (1975). The undesirability of such a result was observed when Congress enacted secs. 419 and 419A in the Tax Reform Act of 1984, Pub. L. 98-369, sec. 511(a), 98 Stat. 494, 854-860. See H. Rept. 98-861 (Conf.) (1984), 1984-3 C.B. (Vol. 2) 1, 409. Sec. 419 limits the deduction for any contribution to a "welfare benefit fund" generally to the amount which would be deductible if the employer provided the benefits directly plus limited reserves for benefits specified in sec. 419A. These provisions are not effective for the years in issue.

(9) Voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual.

Section 1.501(c)(9)–3, Income Tax Regs., defines the term "other benefits" as follows:

(d) *Other benefits.* The term "other benefits" includes only benefits that are similar to life, sick, or accident benefits. A benefit is similar to a life, sick, or accident benefit if—

(1) It is intended to safeguard or improve the health of a member or a member's dependents, or

(2) It protects against a contingency that interrupts or impairs a member's earning power.

(e) *Examples of "other benefits".* Paying vacation benefits, providing vacation facilities, reimbursing vacation expenses, and subsidizing recreational activities such as athletic leagues are considered "other benefits". The provision of child-care facilities for preschool and school-age dependents are also considered "other benefits". The provision of job readjustment allowances, income maintenance payments in the event of economic dislocation, temporary living expense loans and grants at times of disaster (such as fire or flood), supplemental unemployment compensation benefits (as defined in section 501(c)(17)(D)(i) of the Code), severance benefits (under a severance pay plan within the meaning of 29 CFR sec. 2510.3–2(b)) and education or training benefits or courses (such as apprentice training programs) for members, are considered "other benefits" because they protect against a contingency that interrupts earning power. Personal legal service benefits which consist of payments or credits to one or more organizations or trusts described in section 501(c)(20) are considered "other benefits". Except to the extent otherwise provided in these regulations, as amended from time to time, "other benefits" also include any benefit provided in the manner permitted by paragraphs (5) *et seq.* of section 302(c) of the Labor Management Relations Act of 1947, 61 Stat. 136, *as amended,* 29 U.S.C. 186(c) (1979).

(f) *Examples of nonqualifying benefits.* Benefits that are not described in paragraph (d) or (e) of this section are not "other benefits". Thus, "other benefits" do not include the payment of commuting expenses, such as bridge tolls or train fares, the provision of accident or homeowner's insurance benefits for damage to property, *the provision of malpractice insurance,* or the provision of loans to members except in times of distress (as permitted by sec. 1.501(c)(9)–3(e)). * * *

[Emphasis supplied.]

Petitioners do not argue that the malpractice protection provided through the trust is outside the literal language of subsection (f) of the regulation. In this context, it appears that the term "the provision of malpractice insurance" includes

self-insurance or other arrangements that are not true insurance for other purposes. Petitioners' argument is that the exclusion of malpractice insurance from "other benefits" by regulation is an invalid restriction on the statute.

The Supreme Court has articulated the following standard for determining the validity of Treasury regulations:

regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task "of administering the tax laws of the Nation." *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973); accord, *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967); see 26 U.S.C. sec. 7805(a). We therefore must defer to Treasury Regulations that "implement the congressional mandate in some reasonable manner." *United States v. Correll, supra* at 307, 88 S.Ct. at 450; accord, *National Muffler Dealers Assn. v. United States*, 440 U.S. 472, 476–477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). To put the same principle conversely, Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948); accord, *Fulman v. United States*, 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *Bingler v. Johnson*, 394 U.S. 741, 749–751, 89 S.Ct. 1439, 1444–1445, 22 L.Ed.2d 695 (1969). * * * [*Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981).]

As petitioners correctly note, the regulation in issue was promulgated under the Treasury's general rule-making power in section 7805(a) and thus is entitled to less deference than a regulation "issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981). See *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982); *First Charter Financial Corp. v. United States*, 669 F.2d 1342, 1346 (9th Cir. 1982). The term used by Congress, "other benefits," however, is extremely general and is not further defined. Further definition through an "interpretative" regulation is therefore particularly appropriate. Compare *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 476 (1979), *Helvering v. R. J. Reynolds Tobacco Co.*, 306 U.S. 110, 114 (1939), and *Wang v. United States*, 757 F.2d 1000 (9th Cir. 1985), with *United States v. Vogel Fertilizer Co.*, 455 U.S. at 24, *Rowan Cos. v. United States*, 452 U.S. at 253, and *Bolton v. Commissioner*, 694 F.2d 556, 560–563 (9th Cir. 1982). The inquiry for the Court remains whether the regulation is consistent with the statute's plain

language, origin, and purpose. *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. at 477.

Congress first enacted the predecessor to section 501(c)(9) and listed permissible benefits as "life, sick, accident, or other benefits" in the Revenue Act of 1928, ch. 852, sec. 103(16), 45 Stat. 791, 814. Although the provision has been modified several times, Congress has never altered the enumeration of permissible VEBA benefits. See Revenue Act of 1942, ch. 619, sec. 137, 56 Stat. 798, 836; Tax Reform Act of 1969, Pub. L. 91–172, sec. 121(b)(5), 83 Stat. 487, 541. The final regulations under section 501(c)(9) were filed on December 30, 1980, generally effective retroactively to taxable years beginning after December 31, 1954.[7] Thus the regulation in issue is not a contemporaneous interpretation of the statute. In this case, therefore,

the manner in which * * * [the regulation] evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. * * * [*National Muffler Dealers Association, Inc. v. United States*, 440 U.S. at 477.]

The legislative history of section 103(16) of the Revenue Act of 1928 is quite Spartan by current standards:

Voluntary employees' beneficiary associations providing for the payment of life, sick, accident or other benefits to members and their dependents are common to-day, and it appears desirable to provide specifically for their exemption from the ordinary corporation tax. [H. Rept. 2, 70th Cong., 1st Sess. 17 (1928), 1939–1 C.B. (Part 2) 384, 395; S. Rept. 960, 70th Cong., 1st Sess. 25 (1928), 1939–1 C.B. (Part 2) 409, 426.]

In focusing upon organizations that were common at the time of enactment, however, this language is inconsistent with an all-inclusive definition of "other benefits." Indeed, until 1969 the Commissioner administered the VEBA provision without issuing regulations, primarily because most VEBAs were composed of small groups of local employees and provided very limited benefits. See Greenblatt, "New Prop. Regs. expand the

---

[7] Sec. 1.501(c)(9)–8, Income Tax Regs. Petitioners do not challenge the general retroactivity of the regulations. Respondent, on the other hand, relies in part upon sec. 1.501(c)(9)–2(c)(3) of the regulations (requiring and defining employee control of the organization), which was not effective retroactively and hence which does not apply to the present case.

use of voluntary employees' beneficiary associations," 53 J. Taxation 210, 211 (1980).

In 1969, the Commissioner issued proposed regulations under section 501(c)(9). 34 Fed. Reg. 1028 (1969). Although the proposed regulations defined "other benefits" similarly to the definition in the final regulations,[8] the proposed regulations did not specifically exclude malpractice insurance from the term. On July 17, 1980, the Commissioner withdrew the initial proposed regulations and issued new proposed regulations which defined "other benefits" identically to the final regulations. See 45 Fed. Reg. 47,874 (1980).

Congress re-examined the VEBA provisions in connection with the enactment of the Tax Reform Act of 1984. Although Congress did not amend section 501(c)(9), it limited employer deductions for contributions to all "welfare benefit plans" (see *supra* note 6), which include VEBAs, and subjected VEBAs to statutory nondiscrimination and notification requirements. Tax Reform Act of 1984, Pub. L. 98–369, sec. 513(a), 98 Stat. 494, 863–865 (enacting Code sec. 505). In explaining the new requirements, the House Ways and Means Committee, the Senate Finance Committee, and the Joint Taxation Committee each summarized "present law" governing VEBA status. With respect to permissible benefits, the report of the Ways and Means Committee stated:

> In general, a VEBA may provide life, sick, accident, or other benefits in cash or in kind to members or their dependents or beneficiaries.
>
> The regulations specify that "other" benefits means benefits similar to life, sick, or accident benefits. Under the regulations, such benefits must either (1) be intended to safeguard or improve the health of a member or a member's dependents or (2) protect against a contingency that interrupts or impairs a member's earning power. The following benefits are permissible "other" benefits that the regulations permit a VEBA to provide: (1) vacation benefits, (2) vacation facilities, (3) reimbursed vacation expenses, (4) subsidized recreational activities, (5) child care facilities for pre-school and school age dependents, (6) job readjustment allowances, (7) income maintenance payments in the event of economic dislocation, (8) temporary living expense loans and grants at times of disaster (such as fire or flood), (9) supplemental unemployment compensation benefits, (10) severance benefits, (11) personal

---

[8](v) Other benefits. The term "other benefits" include only benefits furnished to a member, his spouse or an individual specified in section 152(a) (even if more than 50 percent support is not furnished) which are similar to life, sick, and accident benefits. A benefit is similar to a life, sick, or accident benefit if it is intended to safeguard or improve the health of the employee or to protect against a contingency which interrupts earning power. * * * [34 Fed. Reg. 1029 (1969).]

legal services, and (12) any benefit provided in the manner permitted under section 302(c)(5) et seq. of the Labor Management Relations Act of 1947.

Impermissible VEBA benefits under the regulations include the following: (1) commuting expenses, (2) accident or homeowner's insurance benefits for damage to property, (3) malpractice insurance * * *

[H. Rept. 98–432 (Part 2) 1286–1287 (1984). Fn. refs. omitted.]

The explanations of the Finance Committee and the Joint Committee contain virtually identical language. Senate Comm. on Finance, Explanation of Provisions Approved by the Committee on March 21, 1984 (Vol. 1) 317 (Comm. Print 1984); Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 796–797 (Comm. Print 1984).

Congress was thus well aware of, and characterized as existing law, the definition of "other benefits" contained in section 1.501(c)(9)–3, Income Tax Regs., and the exclusion of malpractice insurance from such benefits. Moreover, Congress did not attempt to change such existing law, even though it enacted substantial amendments affecting VEBAs. Indeed, nondiscrimination requirements were the subject of existing regulations (sec. 1.501(c)(9)–2(b), –4, Income Tax Regs.), but Congress, believing that such regulations were inadequate, enacted stricter statutory provisions (in new sec. 505). See H. Rept. 98–432 (Part 2) 1289 (1984); Senate Comm. on Finance, Explanation of Provisions Approved by the Committee on March 21, 1984 (Vol. 1) 319 (Comm. Print 1984); Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 799 (Comm. Print 1984). We can only conclude that Congress believed the Treasury's definition of "other benefits" to be a reasonable interpretation of the statute. See *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477 (1979).

Petitioners nevertheless advance an array of arguments against the regulation. They first assert that Congress never intended to limit "other benefits" to benefits similar to life, sickness, or accident benefits. Petitioners cite examples where Congress specifically utilized words such as "similar" or "like" to limit a collective category following a specific enumeration of items. See secs. 61(a)(1), 871(a)(1)(D). Petitioners' argument implies, however, that a VEBA can provide *any* employee benefit, a result which Congress could not have intended.

Given the breadth of the term "other benefits," the Treasury was not unreasonable in defining the term as benefits similar to life, sick, or accident benefits. See *National Muffler Dealers Association, Inc. v. United States*, 565 F.2d 845, 846 (2d Cir. 1977), affd. 440 U.S. 472 (1979).

Petitioners cite *Grange Insurance Association of California v. Commissioner*, 317 F.2d 222 (9th Cir. 1963), in which the Ninth Circuit Court of Appeals held that the term "life, sick, accident, or other benefits" in section 508(c)(8)(B) includes compensation for property damage as well as for personal injury. The court in *Grange Insurance* simply held that the common meaning of "accident" includes property damage and thus that the benefits in issue were "accident or other benefits." 317 F.2d at 224. The court did not, as petitioners assert, define literally the general term "other benefits." Moreover, the Treasury has not promulgated regulations defining the statutory term in issue in *Grange Insurance*. The issue before us, unlike the issue before the Ninth Circuit in *Grange Insurance*, is whether the regulation is consistent with the statute, not how we would interpret the statute in the absence of the regulation. "The choice among reasonable interpretations is for the Commissioner, not the courts." *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. at 488.

Petitioners finally argue that, even if similarity to life, sick, or accident benefits is the proper test for "other benefits," the regulation is internally inconsistent. According to petitioners, malpractice insurance better satisfies the alternative requirement for similarity, i.e., intended to safeguard or improve health or protecting against an interruption or impairment of earning power, than do many of the "permissible other benefits" listed in the regulation.

Protecting the employee from malpractice liability, however, necessarily entails protecting the employer. As this case illustrates, employer protection may be a dominant motive behind such arrangements, unlike the permissible other benefits listed in the regulation. Moreover, in contrast to malpractice protection, most of the specified other benefits enjoy express congressional approval in other areas of the tax law. See, e.g., sections 44 and 188 (child care), 120 and 501(c)(20) (legal services), 127 (educational assistance), 463 (vacation

pay), 501(c)(7) (recreational organizations), and 501(c)(17) (supplemental unemployment compensation). The Treasury perhaps could have reasonably included malpractice insurance in "other benefits." Excluding malpractice protection from such benefits nevertheless was not unreasonable. Cf. *Bricklayers Benefit Plans v. Commissioner*, 81 T.C. 735 (1983); *Water Quality Association Employees' Benefit Corp. v. United States*, 609 F. Supp. 91 (N.D. Ill. 1985).

Even if the exclusion of malpractice insurance were an invalid restriction of the statute, employee participation in the trust was not "voluntary" as defined in section 1.501(c)(9)–2(c)(2), Income Tax Regs. That regulation provides, in relevant part:

(2) *Voluntary.* Generally, membership in an association is voluntary if an affirmative act is required on the part of an employee to become a member rather than the designation as a member due to employee status. However, an association shall be considered voluntary although membership is required of all employees, provided that the employees do not incur a detriment (for example, in the form of deductions from pay) as the result of membership in the association. * * *

In the present case, all employees of ASMG become "members" of the arrangement solely by reason of their employment. Indeed, as the non-unanimous vote indicates, not even all shareholder employees wished to adopt the plan. All physician employees incurred a detriment as a result of membership in the plan. The $10,000 per physician contributions by ASMG reduced the amount of compensation ASMG otherwise could pay the physicians, and the physicians agreed to salary reductions if trust funds were inadequate to pay claims.

### Taxation as an Insurance Company

Petitioners argue that, if the trust is not a VEBA, it is taxable as an insurance company, i.e., under subchapter L (sections 801 et seq.). Although the Internal Revenue Code does not define the term "insurance company," the regulations provide the following guidance:

The term "insurance company" means a company whose primary and predominant business activity during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Thus, though its name, charter powers, and subjection

to State insurance laws are significant in determining the business which a company is authorized and intends to carry on, it is the character of the business actually done in the taxable year which determines whether a company is taxable as an insurance company under the Internal Revenue Code. [Sec. 1.801–3(a)(1), Income Tax Regs.]

As discussed above, the arrangement between ASMG and the trust did not constitute insurance, because risk shifting did not occur. The trust therefore is not an "insurance company" as defined in the above regulation. See *Allied Fidelity Corp. v. Commissioner*, 572 F.2d 1190, 1193–1194 (7th Cir. 1978), affg. 66 T.C. 1068 (1976); *Cuesta Title Guaranty Co. v. Commissioner*, 71 T.C. 278, 286–287 (1978), affd. without published opinion 639 F.2d 787 (9th Cir. 1981).[9]

## Association versus Trust

Petitioners next contend that the trust constituted an association, which is included in the term "corporation" (section 7701(a)(3)), and not a trust for tax purposes.

An arrangement whereby trustees take title to property for the purpose of protecting or conserving it for the beneficiaries constitutes a trust for tax purposes. Sec. 301.7701–4(a), Proced. & Admin. Regs. Regardless of State law classification, however, a trust arrangement created to carry on a profit-making business constitutes an association for tax purposes if, under section 301.7701–2, Proced. & Admin. Regs., the organization more nearly resembles an association than a trust. Sec. 301.7701–4(b), Proced. & Admin. Regs. Under section 301.7701–2(a)(2), Proced. & Admin. Regs., both associates and an objective to carry on business for joint profit are necessary for association status. See also *Morrissey v. Commissioner*, 296 U.S. 344 (1935); *Rohman v. United States*, 275 F.2d 120 (9th Cir. 1960); *Outlaw v. United States*, 494 F.2d 1376 (Ct. Cl. 1974).

In the present case, the objective of the trust, as expressed in the declaration of trust, was merely to receive funds from ASMG and, at ASMG's direction, to pay malpractice claims or insurance premiums. Thus, it in fact resembled a trust more than an association. Because it was merely an agent of ASMG

---

[9]See also *Pariseau v. Commissioner*, T.C. Memo. 1985–124.

with respect to a trust res and was not carrying on business for profit, the trust cannot be taxed as an association.

## Grantor Trust Status

Because the trust was a trust and not an association for tax purposes, we must consider respondent's argument that the trust constituted a grantor trust whose income is taxable to ASMG.

Section 671 provides, in relevant part:

> Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. * * *

The term "grantor" includes a corporation. Sec. 1.671–2(e), Income Tax Regs.

Under section 677(a)(1), the grantor is treated as the owner of a trust if trust income may be distributed to the grantor in the discretion of the grantor or a nonadverse party. The discharge of a legal obligation of the grantor generally constitutes a distribution to the grantor. Sec. 1.677(a)–1(d), Income Tax Regs.

In the present case, trustee was a nonadverse party. Sec. 672(a), (b); sec. 1.672(a)–1, (b)–1, Income Tax Regs. Moreover, trust funds (including income) may be used to satisfy ASMG's legal obligation on malpractice claims resulting from acts of ASMG's employees. This case does not present the situation where the trust and not the grantor is primarily liable on the obligation. Compare *Wiles v. Commissioner*, 59 T.C. 289 (1972), affd. without published opinion 491 F.2d 1406 (5th Cir. 1974), with *Edwards v. Greenwald*, 217 F.2d 632 (5th Cir. 1954). The trust was therefore a grantor trust, and its income is taxable to ASMG.

We need not consider respondent's arguments with respect to other grantor trust provisions.

*Conclusion*

ASMG may not deduct amounts contributed to the trust, and trust income is taxable to ASMG. We have considered and rejected as either irrelevant or erroneous all other arguments raised by the parties. To reflect the foregoing,

> *Decision will be entered for the petitioner in docket No. 13935–83.*
> *Decision will be entered for the respondent in docket No. 13936–83 in the amounts determined in the amended answer.*