DAVID M. CONNELLY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ALABAMA PLASTIC SURGERY, P.A., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Connelly v. Commissioner
Docket Nos. 18322-91, 18323-91[1]
United States Tax Court
T.C. Memo 1994-436; 1994 Tax Ct. Memo LEXIS 440; 68 T.C.M. (CCH) 614; August 25, 1994, Filed *440 Decisions will be entered under Rule 155. David M. Connelly, pro se and as officer of petitioner Alabama Plastic Surgery, P.A. [2]
For respondent: Donald R. Gilliland. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Petitioner David M. Connelly
Additions to Tax
Sec.
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
6661
1984
$ 5,513
$ 1,378.25
$ 275.65
[1]
$ 1,378
1985
4,378
218.90
[1]
Petitioner Alabama Plastic Surgery, P.A.
Taxable
Additions to Tax
Year
Sec.
Sec.
Sec.
Ended
Deficiency
6651
6653(a)(1)
6653(a)(1)(A) 1984
$ 20,371.43
$ 3,055.71
$ 1,018.57
1985
46,086.09
4,608.61
2,304.30
1986
45,429.78
$ 2,271.49
Taxable
Additions to Tax
Year
Sec.
Sec.
Sec.
Ended
6653(a)(1)(B) 6653(a)(2)
6661
1984
[1]
$ 5,092.86 1985
[1]
11,521,52
1986
[1]
11,357.45
*441 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After a concession, [3] the issues for decision are: (1) Whether petitioner Alabama Plastic Surgery, P.A., may deduct certain amounts allegedly paid for medical malpractice insurance premiums; (2) whether petitioner Alabama Plastic Surgery, P.A., may deduct certain alleged rental expenses; (3) whether petitioner Alabama Plastic Surgery, P.A., may deduct certain "trust-related" expenses; (4) whether petitioner David M. Connelly received constructive dividends from Alabama Plastic Surgery, P.A.; (5) whether petitioners are liable for additions to tax for failure to file timely tax returns under section 6651; (6) whether petitioners are liable for additions to tax for negligence under section 6653; and (7) whether petitioners are liable for additions to tax for substantially understating income tax under section 6661. [3]
*442 FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated into this Memorandum Opinion by reference and are found accordingly. Petitioner David Connelly (petitioner) resided in Montgomery, Alabama, at the time he filed his petition. Petitioner Alabama Plastic Surgery, P.A. (APS) had its principal place of business in Montgomery, Alabama, at the time of the filing of its petition. APS is a cash method taxpayer and prior to December 31, 1987, used a fiscal year ending September 30. Background
Petitioner is a plastic surgeon. APS is an Alabama corporation which was formed for the purpose of conducting petitioner's plastic and reconstructive surgery practice. APS was originally incorporated in New York State on October 15, 1973, under the name "David M. Connelly, M.D., P.C.", but was reincorporated under its current name on September 14, 1979, in the State of Alabama. During 1975, APS moved its medical offices from Syracuse, New York, to Jackson Hospital and Clinic (the hospital) in Montgomery, Alabama. Petitioner has been the president, treasurer, sole shareholder, and sole *443 professional employee of APS since 1973. Petitioner's brother, Alan Connelly, has served as APS' secretary since 1973. During the years in issue, the Board of Governors of APS consisted of petitioner, Alan Connelly, and Dr. Frank Randall, a urologist on staff at the hospital. North Lake Leasing Corp. (NLL) is a corporation which was incorporated by petitioner on October 1, 1973, under the laws of the State of Ohio. NLL was formed for the purpose of handling leasing activities for petitioner's medical practice. Alan Connelly was elected president of NLL upon its incorporation and, as of trial, continued to serve NLL in such capacity. From the date of NLL's incorporation until April 1982, petitioner owned all of the stock of NLL. During April 1982, petitioner contributed all outstanding stock of NLL to the capital of APS. During September 1982, APS sold all of the NLL stock to Theodore Wagner, a builder who was a former business associate of petitioner and NLL. Petitioner first leased some office equipment for his office in Syracuse from NLL during 1974. After petitioners moved the medical practice from Syracuse to the hospital in Montgomery, petitioners expanded the practice *444 during 1977 by relocating to larger offices in the sixth-floor addition to the hospital. Petitioners engaged NLL to assume all responsibility for the new lease at the hospital. During December 1977, NLL signed a 5-year lease with the hospital. [4]NLL also acquired equipment and furnishings for the medical practice. Since 1982, petitioner has not had a personal checking account. Instead, APS issued checks for petitioner's personal expenses from its own accounts. APS' books include an account called "Account 121, Advances to Employees", which recorded advances made by APS to petitioner for petitioner's personal expenses. During January 1984, NLL began providing bill-paying services for APS. NLL paid most of APS' expenses through NLL's issuance of a check drawn on an NLL account, made payable to the appropriate vendor. Initially, APS paid NLL a fee equal to 20 percent of the amount of the checks issued for APS. During April *445 1984, the fee was reduced to 7 percent. Petitioner's Reappointment to the Staff of the Hospital
When petitioners moved the medical practice to Montgomery, Alabama, during 1975, petitioner also became a member of the staff of the hospital. Once petitioner became a member of the staff at the hospital, the hospital required that he undergo a reappointment process every 2 years as required by the Joint Commission on Accreditation of Health Care Organizations. Petitioner had to complete an application which provided the hospital with information regarding his malpractice insurance coverage and his involvement in any lawsuits. Prior to 1987, petitioner had repeatedly submitted the requisite applications to the hospital and had included invoices and/or bills purportedly from Barrier Insurance Co. (Barrier) which were stamped with the word "paid" to establish that he was insured. During 1987, in reviewing petitioner's application for reappointment, the medical executive committee at the hospital found that petitioner had not sufficiently established that he had the requisite insurance coverage. When the hospital's Board of Trustees (the hospital board) reviewed the findings of *446 the medical executive committee, the hospital board declined to reappoint petitioner. Petitioner was then given the opportunity for a hearing before a group of five physicians (the physicians committee) on the medical staff. After a formal hearing, the physicians committee found that petitioner had satisfied the insurance requirements and recommended to the hospital board that petitioner be reappointed. Despite the recommendation of the physicians committee, on December 30, 1987, the hospital board concluded that petitioner had not offered adequate proof of coverage. No other physician at the hospital had ever claimed to be insured by Barrier, and petitioner had not provided the hospital board with a certificate of insurance. The hospital board, however, decided to keep petitioner's appointment application "open", which meant that upon provision of specific information to the hospital, petitioner's application might still be approved after further investigation. The hospital board required that petitioner provide: (1) Barrier's address and telephone number along with any other contact information; (2) the name of Barrier's manager; (3) copies of Barrier's financial statements *447 establishing Barrier's capability of paying a $ 1 million judgment; and (4) a copy of petitioner's Barrier insurance policy. In addition to requesting information from petitioner, the hospital board initiated its own investigation in an attempt to verify petitioner's insurance coverage. The hospital board consulted with insurance officials of the State of Alabama, who could not locate Barrier. The hospital board unsuccessfully consulted Alabama Hospital Trust and Fund, an insurance company created by hospitals, and Mutual Assistance, an insurance company for many Alabama doctors. Finally, the hospital board hired a law firm, Sidley & Austin, to investigate a London, England, address on Chapelside Road which had been provided by Alan Connelly. Through a detective agency's investigation, the hospital board discovered that the street number which Alan Connelly provided did not exist on Chapelside Road in London. Ultimately, the hospital was unable to verify petitioner's coverage with Barrier. Medical Malpractice Insurance Deductions
On its 1984, 1985, and 1986 Federal income tax returns, APS claimed deductions in the amounts of $ 67,067, $ 90,136, and $ 77,777.35, respectively, *448 for professional liability insurance. [5] The amounts claimed on APS' returns represent total amounts of checks issued by APS to NLL. Respondent disallowed the deductions and determined that APS did not establish that the amounts were ordinary and necessary business expenses or were expended for the purpose designated. *449 Rental Expenses
Office Space
From December 1, 1977, through November 30, 1982, the hospital leased 2,349 square feet of space to NLL at the monthly rate of $ 880.08 as evidenced by a written lease. Rider #1 to the lease from the hospital to NLL for such time period provided as follows: The leased premises described herein consist of the space described above with heating and air conditioning in accordance with architect's plans and specifications, reasonable plumbing facilities suitable for the space described above taking into account the purposes and size thereof, standard lighting fixtures and electrical outlets, painted metal stud dry-wall partitions placed in accordance with lessee's design and specification, standard acoustical ceilings, standard vinyl floor covering, and wooden doors with standard door hardware. The leased premises does not include cabinet work, non-standard finishing woodwork, wall panelling or wall covering (other than paint), extra or unusual electrical and plumbing outlets and fixtures and other non-standard office fixtures. At the instruction of lessee, lessor agrees to include such floor covering, wall covering, electrical and plumbing *450 fixtures and outlets, cabinet work, finishing woodwork, and other fixtures as the lessee shall specify, provided, however, that such fixtures shall be installed at lessee's cost. Such cost shall be determined by subtracting from the actual cost incurred in the installation of such fixtures the cost of the standard materials agreed by lessor to be furnished as a part of the leased premises. As soon as reasonably practicable after the completion of the leased premises and concurrent construction of the Jackson Hospital Medical Clinic addition, lessor shall submit to lessee a reasonably itemized statement of the additional cost incurred in completing the leased premises, and within 30 days thereafter, lessee agrees to pay to lessor such additional costs. Such additional costs shall bear interest at the rate of 8 percent per annum after 30 days from the date of the statement thereof submitted by lessor to lessee. All fixtures installed by lessor, including those additional fixtures installed at lessee's request as provided herein, shall be become [sic] fixtures of the leased premises and shall not be removed under any circumstances without lessor's written permission.
Upon the *451 expiration of the initial lease, NLL renewed its lease with the hospital for another 5-year period. The second written lease provided that NLL pay monthly rent of $ 1,321.32 for 2,349 square feet of office space for the period beginning December 1, 1982, through November 30, 1987. For the 5-year period beginning May 1, 1983, through April 30, 1988, NLL sublet the 2,349 square feet of hospital office space to APS for a monthly rent of $ 3,800. The agreement was also evidenced by a written lease. On its tax returns for taxable years ended September 30, 1984, September 30, 1985, and September 30, 1986, APS claimed deductions for the monthly rental payments it made to NLL in the amounts of $ 41,800, $ 45,600, and $ 49,400, respectively. [6] Respondent disallowed the rental expenses claimed by APS to the extent that the rental expense paid by APS exceeded the rental expenses paid by NLL on the prime lease from the hospital because APS did not establish that the excess deductions were ordinary and necessary business expenses or were expended for the purpose designated. *452 Furniture and Equipment
During February 1974, NLL began leasing furniture and equipment to APS for use in its medical practice. On March 1, 1984, NLL and APS entered into a 5-year written lease agreement for the furniture and equipment. The lease began on March 1, 1984, and was automatically renewable for a similar term on the first day of each month in which new items were added to the lease. On its tax returns for taxable years ended September 30, 1984, September 30, 1985, and September 30, 1986, APS deducted as part of its rental expenses the amounts of $ 35,780.14, $ 42,333.06, and 51,529.04, respectively, for the furniture and equipment rental. NLL had capitalized the costs of the office furniture and equipment for its taxable years ended September 30 as follows: 1974
$ 3,611.90
1975
-0- 1976
16,042.95
1977
-0- 1978
16,238.99
1979
4,601.06
1980
17,782.49
1981
2,839.00
1982
12,455.81
1983
3,205.02
1984
14,759.07
1985
3,834.13
1986
11,420.17
Respondent determined that APS' allowable deduction for rental expenses for the office furniture and equipment was an amount that would permit NLL to recover three times its capitalized costs over a 7-year *453 period. Respondent allowed deductions for the furniture and equipment in the amounts of $ 24,482, $ 30,807, and $ 25,490 for APS' taxable years ended September 30, 1984, September 30, 1985, and September 30, 1986, respectively. Rolls Royce
During 1980, NLL purchased a 1974 Rolls Royce Silver Shadow for $ 36,500 for the purpose of leasing the vehicle to APS. On December 10, 1980, APS entered into a 60-month written lease with NLL under which APS was to pay $ 1,000 per month for the vehicle. The amount of the monthly lease payments was increased to $ 1,200, effective May 1, 1983. The Rolls Royce was not used for commuting between petitioner's residence and the hospital. The Rolls Royce was garaged at the hospital each night. From September 30, 1982, through November 20, 1986, petitioner drove the Rolls Royce 12,411 miles. On its tax returns for taxable years ended September 30, 1984, September 30, 1985, and September 30, 1986, APS deducted the Rolls Royce lease payments in the amounts of $ 13,200, $ 14,400, and $ 15,600, respectively. Respondent disallowed the deductions claimed by APS for the Rolls Royce rental payments because the payments were not determined to be ordinary *454 and necessary business expenses or expended for the purpose designated. Respondent also determined that APS' expenditures for the Rolls Royce personally benefited petitioner and resulted in constructive dividends to petitioner. Trust-Related Expenses
APS set up a Profit-Sharing Pension Trust (the trust) as part of an employee benefit plan. On its tax return for taxable year ended September 30, 1984, APS deducted $ 11,904.43 as "trust-related" expenses. Respondent disallowed $ 9,469.71 of the trust-related expenses because APS did not establish that the amount in excess of $ 2,434.72 was for an ordinary and necessary business expense or was expended for the purpose designated. The disallowed deductions are composed of a real estate assessment, attorney's fees related to the real estate assessment, and travel expenses. [7]
*455 Real Estate Assessment and Related Attorney's Fees
The trust owned three residential lots in a development known as Foxchase. The trust was a member of the Foxchase Homeowners Association (the Association). The Association imposed an additional assessment on each of its members to finance the construction of roads in the Foxchase development. APS and other members of the Association unsuccessfully sued to block the assessment. APS ultimately paid, on behalf of the trust, the additional assessment fee as well as attorney's fees for the lawsuit. APS paid a total of $ 2,230 during January 1984 and claimed such amount as part of the trust-related expenses on its tax return for its taxable year ended September 30, 1984. The $ 2,230 consisted of $ 1,800 for the assessment, $ 56 for the interest on the assessment, $ 281 for the trust's attorney's fees, and $ 93 for the Association's attorney's fees. Travel Expenses
Washington, D.C.
During 1984, petitioner traveled to Washington, D.C., accompanied by Charlotte Randall. APS paid the round-trip airfare for the trip for both petitioner and Ms. Randall, which totaled $ 860. Petitioner was not the trustee of the trust *456 at the time he took the trip to Washington, D.C. APS claimed a deduction for the amount of the airfare for the trip to Washington, D.C., as part of its trust-related expenses on its tax return for taxable year ended September 30, 1984. Respondent disallowed the deductions for the travel expenses for the trip to Washington, D.C., because APS did not establish that the expenses were ordinary and necessary expenses or expended for the designated purpose. Respondent also determined that APS' payment of the travel expenses of petitioner and Ms. Randall's trip to Washington, D.C., resulted in a constructive dividend to petitioner. Bermuda
During 1984, petitioner traveled to Bermuda accompanied by Ms. Randall. APS paid the expenses for this trip, which totaled $ 2,295.75, consisting of $ 756 for round-trip Montgomery-Bermuda airfare, and $ 1,549.09 for lodging, tips, taxis, motorbike rentals, and parking. [8] Petitioner was not the trustee of the trust at the time he took the trip to Bermuda. *457 APS claimed a deduction for the travel expense for the trip to Bermuda as part of the trust-related expenses on its tax return for taxable year ended September 30, 1984. Respondent disallowed the deductions for the travel expenses for the trip to Bermuda because APS did not establish that the expenses were ordinary and necessary expenses or expended for the designated purpose. Respondent also determined that APS' payment of the travel expenses for petitioner and Ms. Randall's trip to Bermuda resulted in a constructive dividend to petitioner. London, England
During 1984, petitioner traveled to London, England, accompanied by Ms. Randall and Mabel Krass. While in London, petitioner attended an investment seminar sponsored by an organization known as INEX. Petitioner also took a side trip to the Isle of Man. The total cost of the trip to London for petitioner, Ms. Randall, and Ms. Krass, including airfare, lodging, a rental car, the conference fees, petitioner's trip to the Isle of Man, and miscellaneous charges at one of the hotels was $ 3,659.09. Petitioner was not the trustee of the trust at the time he took the trip to London. APS claimed a deduction for the total amount *458 of the trip to London for petitioner and his companions as part of its trust-related expenses on its tax return for taxable year ended September 30, 1984. Respondent disallowed the deductions for the travel expenses for the trip to London because APS did not establish that the expenses were ordinary and necessary expenses or expended for the designated purpose. Respondent also determined that APS' payment of the travel expenses of petitioner and his companions' trip to London resulted in a constructive dividend to petitioner. Constructive Dividends
Prior to and throughout the years in issue, numerous loans [9] were entered into among petitioner, APS, NLL, and Dixie Builders (Dixie). [10] Some of the transactions were recorded through the use of promissory notes. The notes were payable on demand. Generally, the notes provided for the accrual of periodic, monthly interest. Several of the notes had no maturity date. *459 APS often advanced petitioner large sums of money to be used to pay petitioner's personal expenses. The amount due to be repaid by petitioner was recorded in APS' Account 121. Account 121 was periodically reduced on account of purported repayments by petitioner. Respondent determined that some of the transactions resulted in dividend income to petitioner because the advances were made for petitioner's personal benefit and, in essence, had permitted petitioner to use corporate property without compensation to APS. We limit our discussion of the facts with respect to the various loans entered into by petitioner to those transactions which are relevant to respondent's determinations of constructive dividends. Taxable Year 1984
Respondent determined that specific reductions in the Account 121 balance in the amounts of $ 21,000, $ 15,000, and $ 10,000 which reduced petitioner's outstanding obligation to APS constituted constructive dividends for taxable year 1984. On March 12, 1984, petitioner borrowed $ 50,000 from Harter Bank and Trust (Harter Bank). On March 16, 1984, petitioner lent the $ 50,000 to NLL, and NLL gave petitioner note No. 0110. On March 17, 1984, NLL made *460 a $ 21,000 payment to petitioner on note No. 0110, thus reducing the amount owed on the note No. 0110. On March 21, 1984, petitioner made a $ 21,000 cash payment to APS which reduced the amount outstanding in Account 121. On September 28, 1984, petitioner borrowed $ 20,000 from NLL and gave NLL note No. C003, which had no maturity date. On the same date, petitioner made a $ 20,000 payment to APS. Of the $ 20,000, $ 15,000 was used to reduce petitioner's outstanding balance in Account 121, and the remaining $ 5,000 was treated as a loan from petitioner to APS rather than further decreasing Account 121. Petitioner had not made any payments on the $ 20,000 note as of December 31, 1985. On November 1, 1982, APS lent Dixie $ 1,000 as evidenced by note No. 2042. On September 30, 1983, petitioner lent Dixie $ 9,000 as evidenced by note No. 2051. Sometime prior to September 24, 1984, APS assigned note No. 2042 to petitioner. Petitioner then assigned the two notes to APS, and Account 121 was reduced by $ 10,000, the total of the amounts on the face of the notes. Taxable Year 1985
Respondent determined that the reduction of the Account 121 balance in the amounts of $ 8,000, *461 $ 400, and $ 25,625 constituted constructive dividends for taxable year 1985. On September 1, 1985, Account 121 was reduced by $ 8,000. Petitioner did not make any payments to APS on account of the $ 8,000 reduction. Instead, petitioner issued note No. C014 to APS in the amount of $ 8,000 to document the outstanding obligation that existed between petitioner and APS. On the same date, APS assigned note No. C014 to NLL, and the balance due from petitioner to NLL was increased by $ 10,000 in two additional transactions. On September 30, 1985, note No. C014 was deemed paid by offset against note No. 0109 [11] and note No. 0110. [12]
*462 On Septembher 1, 1985, APS made a payment of $ 400 on petitioner's behalf. Account 121 was reduced by $ 400, and petitioner's obligation was evidenced by increasing the amount owed on note No. C015 from petitioner to APS. On the same date, APS assigned the note to NLL. On September 30, 1985, Account 121 was reduced by $ 25,625. Petitioner did not make any payments to APS on account of the $ 25,625 deduction. Instead, petitioner issued note No. C019 to APS in the amount of $ 25,265 to document the outstanding obligation that still existed between petitioner and APS. On the same date, APS transferred the note No. C019 to NLL to reduce the balance owed by APS to NLL. As of December 31, 1985, petitioner owed NLL $ 25,625. APS' and Petitioner's Income Tax Returns
APS reported negative or zero taxable income figures with no claimed net operating loss (NOL) deductions on each of its income tax returns for its taxable years ended September 30, 1981, September 30, 1982, September 30, 1984, September 30, 1985, and September 30, 1986. On APS' return for its taxable year ended September 30, 1983, APS reported taxable income in the amount of $ 9,474.21. On its return for its *463 taxable year ended September 30, 1985, the amount of total deductions, $ 296,055.62, exactly matched the amount of total income. Petitioner reported no wage income on his personal income tax returns for taxable years 1981, 1983, 1984, and 1985. On his 1982 personal income tax return, he reported wages of $ 170,000, which were offset by a reported Schedule E loss of $ 342,456.75. On his 1986 personal income tax return, he reported wages in the amount of $ 140,000, which was substantially offset by a reported Schedule E loss and an NOL carryover. Each of petitioner's personal income tax returns for taxable years 1981 through 1985, inclusive, reports negative total income figures and negative adjusted gross income figures. Petitioner's personal income tax return for 1986 reports zero taxable income. Alan Connelly prepared the tax returns for petitioner and APS for each of the taxable years at issue. APS' tax return for its taxable year ended September 30, 1984, was due on December 15, 1984. APS filed its return for taxable year ended September 30, 1984, on February 25, 1985. APS' tax return for its taxable year ended September 30, 1985, was due on December 15, 1985. APS filed *464 its return for taxable year ended September 30, 1985, sometime between January 28, 1986, and January 31, 1986. Petitioner's 1984 tax return was due August 15, 1985, and petitioner filed his return on July 24, 1986. OPINION Medical Malpractice Insurance Expenses
Petitioners contend that APS is entitled to deduct payments for medical malpractice insurance. Respondent contends that APS is not entitled to deduct the payments because the payments were made to NLL. Respondent further contends that APS has failed to establish that NLL subsequently transferred the payments to Barrier. Under section 162, a taxpayer is allowed to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 1.162-1, Income Tax Regs., specifically includes insurance premiums as deductible business expenses. Insurance premiums, however, are not deductible unless an insurance arrangement actually exists. Anesthesia Serv. Medical Group, Inc. v. Commissioner, 85 T.C. 1031, 1038 (1985), affd. 825 F.2d 241 (9th Cir. 1987). The taxpayer has the burden of proof. Rule 142(a); *465 Welch v. Helvering, 290 U.S. 111 (1933). We agree with respondent that petitioners have not established that an insurance arrangement existed between APS and Barrier. Petitioner testified that he has never had any direct contact with any representatives at Barrier. Alan Connelly testified that NLL does not possess any documents, including correspondence, canceled checks, or contracts which verify payments, transactions, or any other communications between NLL and Barrier. Gregg Everett, counsel for the hospital, testified that petitioner had not been able to prove that he was insured with Barrier. Mr. Everett further testified that the hospital's subsequent efforts to locate an insurance company by the name of Barrier were unsuccessful. Based on the record in the instant case, we are not convinced that the alleged insurance relationship existed between APS and a company by the name of Barrier. The only evidence offered to establish the alleged malpractice insurance payments to Barrier is petitioner's self-serving statements. Petitioner testified that he knew he was insured by Barrier because Barrier defended him in a malpractice suit which, due *466 to Barrier's efforts, was ultimately dismissed. Petitioners, however, offered no documentary evidence supporting such claim. We need not accept at face value such uncorroborated testimony if it is questionable, improbable, or unreasonable. Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Fleischer v. Commissioner, 403 F.2d 403, 406 (2d Cir. 1968), affg. T.C. Memo. 1967-85; Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). After reviewing the record in the instant case, we find petitioner's testimony to be highly questionable. Moreover, petitioners could have called witnesses or introduced documents from the alleged malpractice suit to establish that APS had an insurance policy with Barrier. "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), *467 affd. 162 F.2d 513 (10th Cir. 1947). Based on the record in the instant case, we hold that petitioners have failed to prove that APS was insured by Barrier. Anesthesia Serv. Medical Group, Inc. v. Commissioner, supra. Consequently, we sustain respondent's disallowance of the deductions for professional liability insurance. Rental Expenses
Office Space
Respondent determined that APS is entitled to deduct rental payments in the amount of only $ 1,321.32 per month, the same amount NLL paid to the hospital on the prime lease during the taxable years in issue. Petitioners, however, contend that APS is entitled to deduct its rental payments to NLL in the amount of $ 3,800 per month, the monthly rental rate as specified in its lease with NLL during the taxable years in issue. Petitioners contend that APS may deduct the higher rate because NLL improved the office space before subleasing to APS. Respondent does not dispute that the office space was improved before it was leased to APS. Instead, respondent contends that APS has not shown that NLL made the improvements. Section 162(a)(3) allows deductions for *468 ordinary and necessary "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." The taxpayer has the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners have not offered any evidence other than petitioner's self-serving testimony to substantiate that NLL made the improvements to the office space. The lease between the hospital and NLL specifically provided in Rider #1 that the hospital would provide all of the basic improvements to the premises such as heating, air conditioning, plumbing, lighting, electrical outlets, wall partitions, vinyl floors, and wooden doors. Rider #1 further provided that the leased premises did not include additional improvements such as cabinetry, woodwork, wall paneling or wallpaper, extra or unusual electrical or plumbing outlets, and other nonstandard office fixtures. Rider #1 states, however, that the hospital will install such additional improvements including floor covering (i.e., carpeting), wall covering *469 (i.e., wall paper), electrical and plumbing fixtures and outlets, cabinetry, woodwork or other fixtures as specified by NLL at NLL's cost. Consequently, according to the lease, all of the basic improvements were provided by the hospital. The sublease between NLL and APS [13] does not indicate that any additional improvements were made. Petitioner testified that NLL contracted for and paid for the construction of the office space. Petitioner further testified that NLL purchased and arranged for the installation of solid oak doors, cork wallpaper, carpeting, plate glass, plumbing, an operating room, a folding privacy screen, all of the cabinetry, and all of the lighting fixtures. Petitioners, however, failed to provide any records such as bills or work orders to verify that NLL made such improvements. We need not accept at face value such uncorroborated testimony if *470 it is questionable, improbable, or unreasonable. Quock Ting v. United States, 140 U.S. at 420-421; Fleischer v. Commissioner, 403 F.2d at 406; Boyett v. Commissioner, 204 F.2d at 208; Tokarski v. Commissioner, 87 T.C. at 77. Based on the record in the instant case, we find such testimony to be highly questionable. Moreover, petitioners could have called witnesses or introduced documents to establish the extent of the improvements paid for by NLL. Petitioners' failure to introduce evidence within their possession weighs heavily against them. Wichita Terminal Elevator Co. v. Commissioner, supra at 1165. Accordingly, based on the record in the instant case, we hold that petitioners have failed to prove that APS is entitled to rental deductions for office space in excess of those allowed by respondent. Consequently, we sustain respondent's disallowance of the rental deductions for office space in excess of the amount NLL paid the hospital on the prime lease. Office Furniture and Equipment
Respondent determined that APS *471 may deduct rental expenses for office furniture and equipment to the extent of only $ 24,482, $ 30,807, and $ 25,490 for the respective taxable years in issue. In the notices of deficiency, respondent determined that the proper amounts of rental deductions to APS were those which would permit NLL to recover three times its capitalized costs over a 7- year period. Petitioners contend that APS is entitled to deduct expenses for the rental of furniture and equipment for its medical practice in the amounts of $ 35,780, $ 42,333.06, and $ 51,529.04. Section 162(a) allows taxpayers to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Petitioners have the burden of proof. Rule 142(a). Petitioners, however, have failed to offer any evidence as to why APS is entitled to the deductions in the amounts claimed on its tax returns. Accordingly, petitioners have failed to satisfy their burden of proof. Consequently, we sustain respondent's disallowance of the rental expense deductions for office furniture and equipment beyond the amounts allowed in the notice of deficiency. Rolls Royce
Petitioners contend that *472 APS is entitled to deduct $ 13,200, $ 14,400, and $ 15,600 during the respective taxable years in issue for the expense of leasing the 1974 Rolls Royce Silver Shadow. Respondent contends that the lease payments are not deductible by APS because the leasing of the Rolls Royce was not an ordinary and necessary business expense. In general, section 162 allows a deduction for ordinary and necessary business expenses. The term "ordinary" means that the expense must have a reasonably proximate relationship to the operation of the taxpayer's trade or business. Deputy v. duPont, 308 U.S. 488, 495-496 (1940); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 660 (1962). The term "necessary" in the context of section 162 means that the expense must be "appropriate" or "helpful" to the taxpayer's trade or business. Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985). The taxpayer has the burden of proving that the expenses are ordinary and necessary *473 business expenses. Rule 142(a). Petitioners primarily contend that APS is entitled to the deductions for the lease payments as business expenses because the Rolls Royce was used for advertising and promotion purposes. Petitioners argue that "the vehicle itself bespoke of quality in a way that this marque is known world wide." Petitioners also contend that the lease payments are deductible because the Rolls Royce was used for business transportation to and from medical conventions and was never used for personal transportation purposes. On the other hand, respondent contends that the leasing of the Rolls Royce was for petitioner's personal benefit. With respect to the alleged advertising purpose of the Rolls Royce, respondent contends that the potential for the Rolls Royce to attract customers while parked in the physicians' parking area at the hospital or in a hotel parking deck at a medical convention is, at best, remote. Respondent acknowledges that the "Rolls Royce might conceivably draw attention to Dr. Connelly and evince his personal taste for luxury automobiles", but contends that such a preference "has nothing to do with how well he can perform plastic surgery." With *474 respect to the alleged business transportation use of the Rolls Royce, respondent contends that APS has not established such business use. We specifically addressed the deduction of the leasing expenses of an automobile in Tussaud's Wax Museum v. Commissioner, T.C. Memo. 1966-211. In Tussaud's, the taxpayer claimed deductions for lease payments on a 1962 Lincoln Continental. The taxpayer argued that it would be good business practice to have an expensive car parked outside its business to impress people and give the appearance of financial stability. We denied the deductions because the taxpayer had not established that a proximate relationship existed between the claimed expenses and the business. Our opinion in Tussaud's relied on Henry v. Commissioner, 36 T.C. 879 (1961). In Henry, the taxpayer, a tax attorney and accountant, purchased a yacht on which he placed a flag bearing the number "1040". The purpose of the flag was to invite inquiries and promote taxpayer's business in yachting circles where there were potential clients. In Henry, we stated: Not only is it incumbent upon petitioner *475 to show that the claimed business expenses do not in fact represent expenditures for primarily social or personal purposes but it must appear that there is a proximate -- rather than merely a remote or incidental -- relationship between the claimed expenses and petitioner's practice as a lawyer and an accountant. [Id. at 884; citations omitted.]
We denied the deductions claimed by the taxpayers in Henry because we found that any relationship between the yacht and the promotion of the taxpayer's businesses was merely incidental. The taxpayer in Henry did not offer a single example of a client who came to the taxpayer for professional services based on a boating contact. In the instant case, we find that petitioners have not established a proximate relationship between the Rolls Royce expenses and the promotion of APS' medical practice. We believe that the proposition that the leasing of the Rolls Royce enhances petitioner's skill, usefulness, or reputation as a physician is at best, dubious. In addition, petitioners have failed to offer any evidence of any patients who were attracted to APS' medical practice by virtue of the leasing *476 of the Rolls Royce. [14]
Petitioners also argue that APS may deduct *477 the Rolls Royce expenses because the vehicle was used to transport petitioner to and from medical conventions. [15] Respondent contends that petitioners have not established that the Rolls Royce was used for business purposes. We agree with respondent that petitioners have failed to substantiate that the Rolls Royce was used for travel to and from medical conventions. Section 274(d) provides that no deduction shall be allowed under section 162 for any travel expense unless the taxpayer substantiates by adequate records or sufficient evidence corroborating the taxpayer's own statement (1) the amount of such expense or other item, (2) the time and place of the travel, and (3) the business purpose of the expense. [16]
*478 Petitioners rely on petitioner's testimony that the Rolls Royce was used for various business trips. The explicit language of section 274(d), however, requires that petitioners provide corroborating evidence. Petitioners have failed to offer any of the proof required by section 274(d) to substantiate the travel expenses. Accordingly, we hold that petitioners have failed to meet their burden of proof and therefore sustain respondent's disallowance of the deductions for the lease payments on the Rolls Royce. Trust-Related Expenses
Real Estate Assessment Expenses
On its tax return for taxable year ended September 30, 1984, APS deducted assessment expenses and attorney's fees related to its trust. Respondent contends that APS is not entitled to the deductions because the expenses are properly attributable to the trust. At trial, petitioners acknowledged that the expenses were those of the trust. Accordingly, as the expenses were properly attributable to the trust, we sustain respondent's denial of the deductions for the assessment expenses and the related attorney's fees. See S.A. Manohara, M.D., Inc. v. Commissioner, T.C. Memo. 1994-333. *479 Travel Expenses
Petitioners contend that APS is entitled to deduct trust-related expenses for travel to Washington, D.C., Bermuda, and London, England, pursuant to section 162 because the expenses were related to its trade or business. Respondent contends that APS is not entitled to the deductions because petitioners have not established that the expenses were for ordinary and necessary business purposes. Although APS' tax returns claim that the travel expenses were trust related, it is unclear whether the expenses were incurred on behalf of the trust or on behalf of APS. Petitioner's testimony is confusing on this point since petitioner initially justified the trust-related expenditures by suggesting, in his testimony, that the trips were made to learn about investments for the trust. Subsequently, however, petitioner acknowledged that he was not the trustee at the times when the trips were taken. Petitioner also testified that he took the trips to learn about investment opportunities for APS. In any event, because petitioner testified that the trips were related to certain investments made by APS, we will proceed to analyze APS' entitlement to the deductions rather that *480 summarily denying the deductions as expenses of the trust as we did with respect to the real estate assessment expenses. Section 162(a)(2) allows deductions for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including trade or business travel expenses while away from home. Section 212 allows deductions for all ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. [17]
To be deductible under section 162(a)(2) or section 212, travel expenses must be: (1) Ordinary or "normal, usual or customary," Deputy v. duPont, 308 U.S. 488, 495 (1940); (2) necessary *481 or "appropriate and helpful," Welch v. Helvering, 290 U.S. 111, 113 (1933); and (3) proximately related to the trade or business of the taxpayer, Kinney v. Commissioner, 66 T.C. 122 (1976); Hosbein v. Commissioner, T.C. Memo. 1985-373. Additionally, traveling expenses to and from a destination will not be deductible if the primary purpose of the trip is personal. Kinney v. Commissioner, supra at 127; sec. 1.162-2(b)(1), Income Tax Regs.
Section 274(d) provides that no deduction shall be allowed under section 162 or 212 for any travel expense unless the taxpayer substantiates by adequate records or sufficient evidence corroborating the taxpayer's own statement (1) the amount of such expense or other item, (2) the time and place of the travel, (3) the business purpose of the expense. Petitioner testified that the three trips in issue were financial meetings. Petitioners do not dispute that the meetings were nonmedical in nature. Petitioners, however, contend that even a nonmedical meeting can be in pursuit of a trade or business. Petitioners also contend *482 that APS may deduct the expenses of petitioner's companion or companions on the various trips. Because of the factual distinctions among the three trips, we address each trip separately. Washington, D.C.
APS paid for round-trip airfare for petitioner and a companion, Ms. Randall, to visit Washington, D.C. Petitioners maintain that petitioner and Ms. Randall attended a seminar organized by the American Society of Aesthetic Surgery about the marketing of plastic surgery services. Petitioner testified that he learned about equipment which would enable a plastic surgeon to create an electronic image of a patient and then allow the surgeon to alter the image to demonstrate to the patient the potential enhancements that may be realized through plastic surgery. Respondent contends that petitioner has not substantiated the business purpose. We agree with respondent. Although a seminar on the marketing of plastic surgery services might qualify as an ordinary and necessary expense which is proximately related to petitioner's plastic surgery practice, petitioner's uncorroborated testimony is insufficient in the instant case to satisfy petitioners' burden of proof. In addition, petitioners *483 have not met the strict substantiation requirements of section 274(d). Petitioners have not offered any evidence other than petitioner's testimony with respect to the trip to Washington, D.C. There is no documentation in the record to corroborate the business purpose of the trip. [18] We note that petitioners could have introduced documents or called witnesses to corroborate the business purpose of the trip. Petitioners' failure to introduce evidence in their possession weighs heavily against them. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165. Additionally, even if petitioners had established through corroborating evidence that petitioner had a valid business purpose in making the trip to Washington, D.C., we would deny the *484 deduction for Ms. Randall's airfare based on the record in the instant case because petitioners failed to introduce any independent evidence corroborating Ms. Randall's purpose in accompanying petitioner. Sec. 274(d). Bermuda
APS paid the expenses of petitioner and Ms. Randall's travel to Bermuda. Petitioners contend that petitioner and Ms. Randall attended an investment seminar which related to his trade or business. Although petitioners concede that the meeting "was not plastic surgery," they contend that the "gain * * * paid a lot of expenses" for APS. Respondent contends that petitioner's inconsistent testimony regarding the business purpose, i.e., his assertion that the expenses were incurred for the trust and then his assertion that the expenditures were for APS, renders the business purpose claim too tenuous to be allowed. We agree with respondent that the business purpose claim of the expenses is quite tenuous. Consequently, we are not convinced that the convention enhanced petitioner's skills as a plastic surgeon nor contributed to the business of APS. Accordingly, we hold that the travel expenses are not deductible under section 162. As to section 212, [19] *487 *485 petitioner testified that, as a result of attending the conference in Bermuda, he has been able to improve the financial performance of APS both by increasing the profitability of investments and reducing the risk of loss from making uninformed investments. Petitioners, however, failed to establish that the knowledge petitioner gained at the seminar affected any specific investments. Although petitioner testified that the Bermuda seminar educated him about timing strategies for entering and exiting the market and that he utilized such strategies in investing in a Fidelity mutual fund [20] several months after the Bermuda trip, APS' tax return indicates that APS invested in the Fidelity Overseas mutual fund almost 2 years after the stipulated time of the trip. A taxpayer ordinarily is not permitted to deduct travel expenses under section 212 for trips which merely give him "a feel for the market" and are not tied to specific transactions. Kinney v. Commissioner, 66 T.C. at 127 (citing Walters v. Commissioner, T.C. Memo. 1969-5). Even if petitioners were able to link the trip to specific investments, they have not satisfied *486 the substantiation requirements of section 274(d). Petitioners presented no documentation whatsoever as to the business purpose of the trip to Bermuda. [21]
Moreover, assuming that petitioners could establish that the travel expenses were ordinary and necessary business or investment expenses, we would still hold that Ms. Randall's travel expenses were nondeductible as personal expenses. Petitioner testified that he invited Ms. Randall to accompany him to encourage her to stay on as a patient, to refer other patients, and to supply APS with investment funds. Petitioners, however, offered no evidence corroborating the purpose of having Ms. Randall accompanying petitioner. Consequently, petitioners have not satisfied all of the requirements of section 274(d). We therefore sustain respondent's disallowance of the travel expenses for the trip to Bermuda. London
*488 APS paid for petitioner, Ms. Randall, and Ms. Krass to travel to London, England. Petitioners contend that petitioner and his two companions attended the seminar sponsored by INEX to learn about foreign investment opportunities. Respondent contends that petitioner's inconsistent testimony regarding the business purpose, i.e., his assertion that the expenses were incurred for the trust and then his assertion that the expenditures were for APS, renders the business purpose too tenuous to be allowed. As to petitioner's contention that the expenses are deductible under section 162, we agree with respondent. We fail to see any connection between the expense and petitioner's profession of plastic surgery. Consequently, we are not convinced that the seminar enhanced APS' business or petitioner's skills as a plastic surgeon. Accordingly, we hold that the travel expenses are nondeductible under section 162. As to petitioners' contention that the expenses are deductible under section 212, [22] petitioner testified that as a result of attending the conference in London, he learned about investing in an American mutual fund which purchased either American depository receipts of foreign *489 companies or the stock of foreign companies. Petitioners, however, failed to establish a link between the conference and any investments. Although petitioner testified that the London seminar taught him about international mutual funds and that he invested in a Fidelity mutual fund several months after the London trip, APS' tax return indicates that APS invested in the Fidelity Overseas mutual fund almost 2 years after the stipulated time of the trip. Consequently, as the trip is not tied to any specific transaction, Kinney v. Commissioner, supra at 127 (citing Walters v. Commissioner, T.C. Memo. 1969-5), we hold that APS is not entitled to any deduction for such expenses.
*490 We further note that the provisions of section 274(h), which apply to trips taken outside North America, apply to the trip to London. Section 274(h), in pertinent part, requires that the taxpayer establish (1) for taxable years beginning prior to January 1, 1987, that the meeting attended was directly related to an activity engaged in for profit under section 212, and (2) that it was as reasonable for the meeting to be held outside the North American area as within the North American area. Petitioners have neither established that the meeting was directly related to activity under section 212 nor offered any evidence which establishes that it was as reasonable for the meeting to be held outside North America as within North America. Additionally, assuming that petitioners could establish that the travel expenses were ordinary and necessary business or investment expenses, we would still hold that Ms. Randall and Ms. Krass' travel expenses were nondeductible. Petitioner testified that he invited Ms. Randall and Ms. Krass to attend to encourage them to stay on as patients, to refer other patients, and to supply APS with investment funds. As petitioners have failed to offer any *491 corroborating evidence as to the purpose of having Ms. Randall and Ms. Krass accompany petitioner, petitioners have not satisfied all of the requirements of section 274(d). Consequently, we sustain respondent's disallowance of the travel expenses for the trip to London. Constructive Dividends
Pursuant to sections 301(c) and 316(a), a corporation's distributions of property to a shareholder with respect to its stock are taxed as dividends to the shareholder to the extent of the corporation's earnings and profits. Sec. 301(c)(3). Corporate payments to a shareholder which confer personal benefits on the shareholder may constitute constructive dividends to the shareholder. "The fact that no dividends are formally declared does not foreclose the finding of a dividend-in-fact." Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84. Respondent contends that petitioner received constructive dividends from APS in the form of (1) reductions in the amounts petitioner owed APS recorded in its Account 121, (2) the lease payments for the Rolls Royce, and (3) the payments of travel expenses for petitioner *492 and his companion or companions to visit Washington, D.C., Bermuda, and London. We address each contention separately. Reductions in Account 121
APS made many cash advances to petitioner and recorded them in its Account 121. Petitioners contend that petitioner repaid some of the amount due through cash payments and the assignment of promissory notes on which petitioner was the obligee. Respondent contends that the transactions were not legitimate and that petitioner indulged in an "elaborate scheme" in which petitioner purportedly borrowed money from APS, but was relieved of his indebtedness behind a cloud of purported loan transactions among petitioner, NLL, APS, and Dixie. The controlling factor in deciding whether the transactions between APS and petitioner were loans or constructive dividends is whether at the time of the withdrawals the parties intended that the amounts would be repaid. Berthold v. Commissioner, 404 F.2d 119 (6th Cir. 1968), affg. T.C. Memo. 1967-102; Haag v. Commissioner, 88 T.C. 604 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). *493 We must examine all of the facts and circumstances surrounding the transactions. J.S. Biritz Constr. Co. v. Commissioner, 387 F.2d 451, 453 (8th Cir. 1967), reversing T.C. Memo. 1966-227; Haag v. Commissioner, supra.In analyzing the transactions, respondent's determinations that the cash "advances" are dividends are presumptively correct, and petitioners have the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Wilson v. Commissioner, 10 T.C. 251, 255-256 (1948), affd. sub nom. Wilson Bros. & Co. v. Commissioner, 170 F.2d 423 (9th Cir. 1948). Taxable Year 1984
Respondent determined that the reduction of the Account 121 balance in the amounts of $ 21,000, $ 15,000, and $ 10,000 constituted constructive dividends for taxable year 1984. On March 12, 1984, petitioner borrowed $ 50,000 from Harter Bank. On March 16, 1984, petitioner lent the $ 50,000 to NLL, and NLL gave petitioner note No. 0110. On March 17, 1984, NLL *494 made a $ 21,000 payment to petitioner on note No. 0110, thus reducing the total amount owed under note No. 0110. On March 21, 1984, petitioner made a $ 21,000 cash payment to APS which reduced the amount outstanding in Account 121. Respondent contends that petitioner engaged in a plan under which NLL ostensibly made a partial payment on one of the loans from petitioner, but was actually funneling funds from itself to APS to relieve petitioner of his obligation under Account 121. On September 28, 1984, petitioner borrowed funds from NLL and gave NLL note No. C003, which had no maturity date. On the same date, petitioner made a $ 20,000 payment to APS. Of the $ 20,000, $ 15,000 was used to reduce petitioner's outstanding balance in Account 121, and the remaining $ 5,000 was treated as a loan from petitioner to APS rather than further decreasing Account 121. Petitioner had not made any payments on the $ 20,000 note as of December 31, 1985. Respondent contends that NLL in effect transferred $ 15,000 to APS to reduce petitioner's balance in Account 121. On November 1, 1982, APS lent Dixie $ 1,000 as evidenced by note No. 2042. On September 30, 1983, petitioner lent Dixie $ 9,000 *495 as evidenced by note No. 2051. Sometime before September 24, 1984, APS assigned note No. 2042 to petitioner. Petitioner then assigned the two notes to APS, and Account 121 was reduced by $ 10,000, the total of the amounts on the face of the notes. Respondent contends that because the notes were several years old, their fair market value was less than face value. Respondent further contends that because the note No. 2042 was merely transferred by APS to petitioner and then back to APS, petitioner received a $ 1,000 constructive dividend since he was relieved of the indebtedness. Respondent contends that note No. 2051 is suspect because petitioner and Alan Connelly owned 48 percent of Dixie and never intended to make a payment on the note. Respondent thus argues that the $ 9,000 reduction is a constructive dividend to petitioner. Taxable Year 1985
Respondent determined that the reduction of the Account 121 balance in the amounts of $ 8,000, $ 400, and $ 25,625 constituted constructive dividends for taxable year 1985. On September 1, 1985, Account 121 was reduced by $ 8,000. Petitioner did not make any payments to APS on account of the $ 8,000 reduction. Instead, petitioner *496 issued note No. C014 to APS in the amount of $ 8,000 to document the outstanding obligation that still existed between petitioner and APS. On the same date, APS assigned note No. C014 to NLL, and the balance due from petitioner to NLL was increased by $ 10,000 in two additional transactions. On September 30, 1985, note No. C014 was deemed paid by offset against note No. 0109 and note No. 0110. Respondent contends that petitioner relieved himself of an $ 8,000 obligation under Account 121 by issuing a separate promissory note under which he had no economic burden. Respondent contends the intricate web of loans among the parties indicates the lack of substance to the underlying obligations. Respondent further contends that petitioner utilized NLL to eliminate his own personal obligations. On September 1, 1985, APS made a payment of $ 400 on petitioner's behalf. Account 121 was reduced by $ 400 and petitioner's obligation was evidenced by increasing the amount owed on note No. C015 from petitioner to APS. On the same date, APS assigned the note to NLL. Respondent contends that petitioner was relieved of his obligation to pay $ 400 to APS. On September 30, 1985, Account 121 *497 was reduced by $ 25,625. Petitioner did not make any payments to APS on account of the $ 25,625 deduction. Instead, petitioner issued note No. C019 to APS in the amount of $ 25,265 to document the outstanding obligation that still existed between petitioner and APS. On the same date, APS transferred note No. C019 to NLL to reduce the balance owed by APS to NLL. As of December 31, 1985, petitioner owed NLL $ 25,625. Respondent contends that there is no indication that the note was ever paid. Respondent further contends that the note lacks economic substance. In essence, respondent argues that the facts and circumstances indicate that APS was generating deductions by making payments to NLL and that NLL was, in turn, transferring money to APS when NLL was actually relieving petitioner of debt for his personal expenses. Respondent contends that the loans were merely a "smokescreen" to hide the fact that payments were being made by NLL to satisfy petitioner's personal obligations. As stated above, the characterization of a transfer from corporation to a shareholder depends on the facts and circumstances involved. Factors that the courts have considered in reaching a decision include *498 the following: The extent to which the shareholder controlled the corporation; whether the corporation had a history of paying dividends; the existence of earnings and profits; the magnitude of the advances; how the parties recorded the advances on their books and records; whether the parties executed notes; whether security was provided for the advances; whether there was a fixed schedule of repayment; whether interest was paid or accrued; whether the shareholder made any repayments; whether the shareholder was in a position to repay the advances; and whether the advances to the shareholder were made in proportion to his stockholdings. Thielking v. Commissioner, T.C. Memo. 1987-227 (citing Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 n.7 (5th Cir. 1974); J.S. Biritz Constr. Co. v. Commissioner, 387 F.2d 451, 453 (8th Cir. 1967), revg. T.C. Memo. 1966-227). None of these factors, standing alone, is determinative. Alterman Foods, Inc. v. United States, supra at 876-877 n.6. The objective factors are useful in determining *499 whether there is a true intention to repay. Id. at 877. In the instant case, petitioners have failed to present any evidence or make any arguments as to petitioner's intent to repay the advances made by APS. Based upon our exhaustive review of the record in the instant case, we conclude that petitioners have failed to prove that respondent's determinations with respect to the reductions in Account 121 are erroneous. Petitioner was the sole shareholder of APS. Consequently, petitioner completely controlled the extent to which APS made the advances to petitioner. APS did not have a history of declaring dividends, and APS apparently had substantial earnings and profits with which to do so. APS made numerous advances. Petitioner did not provide any security for the advances, and there was no fixed schedule of repayment. No interest payments were made, although they were provided for in the notes. APS' disinterest in interest is remarkable. Additionally, the repayments were made in "roundabout" patterns which strongly suggest that petitioner never intended to repay the advances, but merely wanted to make it appear that he had repaid the advances. *500 Finally, it appears that petitioner had the money to repay the advances, but merely developed a way to have his personal expenses paid by the corporation without any cost to him. Based on the foregoing, we hold that petitioners have failed to prove that the reductions in Account 121 were not constructive dividends to petitioner. Rolls Royce and Travel Expenses
Corporate payments for property used by a shareholder for purposes which are not proximately related to the corporate business result in the inclusion of the fair rental value of such property in the shareholder's income as constructive dividends to the extent of the corporation's earnings and profits. Falsetti v. Commissioner, 85 T.C. 332, 356 (1985). For a corporate benefit to be treated as a constructive dividend, the item must primarily benefit the taxpayer's personal interests as opposed to the business interests of the corporation. Ireland v. United States, 621 F.2d 731 (5th Cir. 1980); Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388 (9th Cir. 1977), remanding T.C. Memo. 1973-223; *501 Commissioner v. Riss, 374 F.2d 161 (8th Cir. 1967). Rolls Royce
We have held above that the lease payments of the Rolls Royce do not constitute ordinary and necessary business expenses. Consequently, our remaining inquiry as to the Rolls Royce expenses is limited to whether petitioner obtained a personal benefit from APS' leasing of the Rolls Royce. Petitioners have not offered any documentation establishing the use of the vehicle for business purposes. The only evidence petitioners offered is petitioner's self-serving testimony that he used the car to drive to medical conventions. We need not accept petitioner's self-serving statements if they are questionable, improbable, or unreasonable. Quock Ting v. United States, 140 U.S. at 420-421; Fleischer v. Commissioner, 403 F.2d at 406; Boyett v. Commissioner, 204 F.2d at 208; Tokarski v. Commissioner, 87 T.C. at 77. Under the circumstances of the instant case, we find such testimony to be questionable. Consequently, petitioners have failed to prove that petitioner did *502 not derive personal benefit from the leasing of the Rolls Royce. Accordingly, we hold that petitioner received constructive dividends equal in amount to the lease payments made by APS to NLL. Travel Expenses
We have held above that the travel expenses of petitioner and his companions to Washington, D.C., Bermuda, and London do not constitute ordinary and necessary business expenses. Consequently, our remaining inquiry as to the travel expenses is limited to whether petitioner obtained a personal benefit from APS' payment of the travel expenses. Petitioners concede that the trips were not for medical education. Petitioners also acknowledge that petitioner did some sightseeing during his trip to London. Respondent contends that all of the trips were to locations that have personal appeal and that petitioner did not adequately substantiate his itinerary to establish that he did not engage in any personal activities on the trips. Accordingly, respondent contends that the amounts paid for Ms. Randall and Ms. Krass' travel expenses are also constructive dividends. We agree with respondent. Petitioners have not presented any credible evidence establishing that the trips were *503 nonpersonal in nature. Accordingly, we sustain respondent's determinations that the travel expenses are constructive dividends to petitioner. Section 6651(a)(1) Additions to Tax
In the case of a taxpayer who fails to timely file a tax return, section 6651(a)(1) provides for an addition to tax, unless the taxpayer can demonstrate that the failure to file was due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1). Although reasonable cause is not defined in the Internal Revenue Code, the regulations state: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect has been defined as a "conscious, intentional failure or reckless indifference". United States v. Boyle, 469 U.S. 241, 245 (1985). The questions of whether petitioners have acted with "reasonable cause" and not with "willful neglect" are questions of fact, and petitioners have the burden of proof. Rule 142(a); Lee v. Commissioner, 227 F.2d 181, 184 (5th Cir. 1955), *504 affg. a Memorandum Opinion of this Court. It is undisputed that APS' corporate income tax returns for taxable years ended September 30, 1984, and September 30, 1985, were not timely filed. Consequently, we must decide whether APS' untimely filing was due to reasonable cause and not due to willful neglect. Petitioners failed to introduce any evidence or make any arguments as to the additions to tax under section 6651(a)(1) as to APS. Consequently, petitioners have failed to meet their burden of proof as to APS' failure to file addition. Accordingly, we sustain respondent's determination with respect to the additions to tax under section 6651(a)(1) as to APS for its taxable years ended September 30, 1984, and September 30, 1985. As to petitioner, it is undisputed that his 1984 tax return was not timely filed. Consequently, we must decide whether petitioner's untimely filing was due to reasonable cause and not due to willful neglect. Petitioners contend that petitioner had reasonable cause for the late filing of his return because he was preoccupied with the audit of his taxable years 1980 through 1983 as well as involved with obtaining a refund for taxable year 1977. It is *505 well established that an assertion of being "too busy" will not relieve a taxpayer from the duty to file a timely return. Dustin v. Commissioner, 53 T.C. 491, 507 (1969), affd. 467 F.2d 47, 50 (9th Cir. 1972); Olsen v. Commissioner, T.C. Memo. 1993-432; Smith v. Commissioner, T.C. Memo. 1993-203; Weiland v. Commissioner, T.C. Memo. 1982-601. Consequently, we sustain respondent's determination as to the failure to timely file addition as to petitioner for taxable year 1984. Section 6653 Additions to Tax for Negligence
Section 6653(a) provides that if any part of any underpayment of tax is due to negligence or the intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. [23] *506 Section 6653(a) also imposes an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. [24]
Respondent's determination that petitioners were negligent is presumed correct, and petitioners bear the burden of proving that they were not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985). A taxpayer's failure to file a timely tax return is a prima facie case of negligence. Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990). For *507 APS' taxable years ended September 30, 1984, and September 30, 1985, and petitioner's taxable year 1984, petitioners failed to introduce evidence tending to meet or rebut respondent's prima facie case of negligence. Consequently, we sustain respondent's determinations for such years based on the failure to timely file tax returns. For APS' taxable year ended September 30, 1986, and petitioner's taxable year 1985, petitioners have failed to offer any evidence to support a finding that petitioners are not negligent. Petitioners merely maintain that petitioner is incapable of behaving in a negligent manner. Based on petitioners' failure to meet their burden of proof, we sustain respondent's determinations as to the negligence additions. Section 6661 Additions to Tax For Substantial Understatement of Income Tax
Section 6661(a) imposes an addition to tax on a substantial understatement of income tax. An understatement is substantial where it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). APS had substantial understatements for all of the years in issue. Petitioner had a substantial understatement for taxable *508 year 1984. The section 6661 addition to tax is not applicable, however, if there was substantial authority for the taxpayer's treatment of the items in issue or if relevant facts relating to the tax treatment were disclosed on the return. Sec. 6661(b)(2)(B)(i) and (ii). Petitioners have not made any arguments regarding the substantial understatement additions to tax. Accordingly, we hold that petitioners are liable for the additions to tax under section 6661 as determined by respondent. All other arguments of petitioners have been considered and found to be without merit. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. These cases were consolidated by order of the Court. For convenience, unless otherwise indicated, these cases will be collectively referred to as "the instant case".↩
2. Petitioner was formerly represented by Alan Connelly, who withdrew his entry of appearance prior to the trial of the instant case.↩
1. 50 percent of the interest due on the deficiency.↩
3. Respondent has conceded that petitioner David M. Connelly properly claimed partnership losses on his 1984 and 1985 Federal income tax returns.↩
4. Prior to December 1977, neither NLL nor APS had a written lease with the hospital.↩
5. APS habitually issued the checks at the end of the alleged policy periods. The following is an itemized list of the checks and the policy periods for which petitioners allege the checks were issued: Ending Date of
Date
Check No. Amount
Policy Period 09/27/84
1013
$ 7,973
9/30/83
09/28/84
1016
30,000
9/30/84
09/30/84
1020
24,087
9/30/84
09/30/84
1021
5,007
9/30/85
Total--09/30/84  67,067
09/01/85
1127-1130
$ 20,028
9/30/85
09/16/85
1133-1136
20,028
9/30/85
09/17/85
1137,1138
10,014
9/30/85
09/18/85
1139
5,016
9/30/85
09/29/85
1147,1148
14,020
9/30/86
09/29/85
1150-1152
21,030
9/30/86
Total--09/30/85  90,136
09/12/86
1210
$ 7,010
9/30/86
09/16/86
1212-1216
42,060
9/30/86
09/16/86
1220
11
9/30/86
09/30/86
1227
9,565.45
9/30/87
09/30/86
1233-1234
19,130.90
9/30/87
Total--09/30/86  77,777.35
APS' check number 1021, dated Sept. 30, 1984, to NLL for $ 5,007 was deposited by NLL on July 3, 1985. APS' check number 1020, dated Sept. 30, 1984, to NLL for $ 24,087 was deposited by NLL on Sept. 5, 1985.↩
6. The amount of the deductions taken by APS varied from year to year because APS deducted 11 months of rent totaling $ 41,800 for its taxable year ended Sept. 30, 1984, 12 months of rent totaling $ 45,600 for its taxable year ended Sept. 30, 1985, and 13 months of rent totaling $ 49,400 for its taxable year ended Sept. 30, 1986.↩
7. Specifically, respondent disallowed $ 2,230 in real estate assessment and attorney's fees, $ 860 for the trip to Washington, D.C., $ 2,295 for the trip to Bermuda, and $ 3,659.09 for the trip to London, England. We note that these figures total $ 9,044.09, which is $ 425.62 less than $ 9,469.71, the total amount denied in the notice of deficiency. The parties have failed to account for the discrepancy.↩
8. The parties stipulated that the $ 1,549.09 consisted of $ 1,349.09 for lodging, $ 4 for tips, $ 57 for taxis, $ 44 for motor bike rentals and $ 18 for parking. We note that these amounts total $ 1,472.09, which is $ 77 less than $ 1,549.09. The parties have failed to account for the discrepancy.↩
9. We refer to the various transactions as "loans" for convenience, not as a characterization of the transaction in any way.↩
10. There is little information in the record regarding Dixie Builders other than the parties' stipulation that Dixie Builders was, at one time, owned by petitioner, Alan Connelly, and Theodore Wagner. Petitioner owned 45 percent, Alan Connelly owned 3 percent, and Theodore Wagner owned 52 percent.↩
11. Note No. 0109 was given by NLL to petitioner on Dec. 1, 1983, reflecting that NLL owed petitioner $ 21,754.69. From December 1983 through September 1985, NLL and petitioner engaged in many transactions which affected the amount due on note No. 0109. On Sept. 30, 1985, the date on which the debt was extinguished by offset with note No. C014, NLL owed petitioner $ 10,990.10 on note No. 0109.↩
12. Note No. 0110, as stated above, was originally given by NLL to petitioner in the amount of $ 50,000 on Mar. 16, 1984, when petitioner lent NLL the $ 50,000 he borrowed from Harter Bank. From March 1984 through September 1985, NLL and petitioner engaged in many transactions, which affected the amount due on note No. 0110. On Sept. 30, 1985, the date on which the debt was extinguished by offset with note No. C014, NLL owed petitioner $ 26,890 on note No. 0110.↩
13. We note NLL's sublease with APS is an identical form lease to the lease between the hospital and NLL with the exception of any riders attached.↩
14. We note that in response to respondent's contention that the Rolls Royce would not attract customers in the physicians' parking lot at the hospital or in a hotel parking lot at a medical convention, petitioner argues that the Rolls Royce was viewed by millions of people when the car appeared in a television miniseries. On brief, petitioner states that the real advertising impact for it [the Rolls Royce], however, was when it was used as a central part of the story "Roses for the Rich", a CBS miniseries starring Bruce Dern and Lisa Hartman. The film was made in Warrior, Alabama. The large screen credit for the car to Alabama Plastic Surgery, P.A. was seen for most of the week by eight and one-half million people.↩
Petitioners did not mention this appearance of the Rolls Royce prior to the answering brief. In any event, petitioners have not established when the show was aired or that petitioners gained any patients from the viewing.
15. At trial, petitioner briefly mentioned that the Rolls Royce was also used for banking purposes. Petitioner, however, failed to further elaborate such a claim and did not offer any evidence to substantiate such a claim.↩
16. For taxable years beginning after Dec. 31, 1985, sec. 274(d) does not apply to a "qualified nonpersonal use vehicle" which is defined in sec. 274(i) as any vehicle, which by reason of its nature, is not likely to be used more than a de minimis amount for personal purposes. Sec. 274(i), however, does not apply to any of APS' taxable years in issue since all of the years in issue began prior to its effective date. Even if sec. 274(i) were effective for the years in issue, we note that a Rolls Royce is a passenger automobile, and would therefore not meet the definition of "qualified nonpersonal use vehicle". See Davis v. Commissioner, T.C. Memo. 1993-599↩. Consequently, APS would still be subject to the strict substantiation requirements of sec. 274(d).
17. We note that for taxable years beginning after Dec. 31, 1986, deductions are no longer permissible under sec. 212 for expenses allocable to a convention, seminar, or similar meeting pursuant to sec. 274(h)(7).↩
18. The parties stipulated the cost of the airfare and the dates of the trip. We note, however, that although the parties stipulated that the trip to Washington, D.C., occurred in July, petitioner testified that the trip occurred in March 1984.↩
19. Although petitioners argue that the travel expenses were authorized under sec. 162, petitioners emphatically maintain that the purpose of petitioner's attendance at the conventions was to learn about investment opportunities to "make money". Consequently, we analyze whether the travel expenses are deductible under sec. 212. As noted above, had the expenses been incurred in a taxable year beginning after Dec. 31, 1986, sec. 274(h)(7) would deny the deduction of the expenses because they were expended for a seminar for sec. 212 purposes. We note that the allocation rules contained in sec. 274(c) for travel outside the United States do not apply to the trip to Bermuda because the trip fits within the exception under sec. 274(c)(2)(A) for travel that does not exceed 1 week. Additionally, we note that the provisions of sec. 274(h) which apply to trips taken outside North America do not apply to petitioner and Ms. Randall's trip to Bermuda because North America is deemed to include Bermuda for conventions, seminars, and meetings which began after July 1, 1983, under sec. 274(h)(6)(B). Sec. 274(h), in pertinent part, requires that the taxpayer establish (1) for taxable years beginning prior to Jan. 1, 1987, that the meeting attended was directly related to an activity engaged in for profit under sec. 212, and (2) that it was reasonable for the meeting to be held outside the North American area.↩
20. Specifically, petitioner testified that he made the Fidelity investment based on the knowledge gained at the Bermuda and London seminars combined.↩
21. As with the trip to Washington, petitioner's testimony on the dates of the trip was different from the stipulation. Additionally, petitioner did not present any corroborating evidence of the date and times of the meetings in Bermuda.↩
22. Although petitioner argues that the travel expenses to London were authorized under sec. 162, he emphatically maintains that the purpose of attendance at the conventions was to learn about investment opportunities to "make money". Consequently, we analyze whether the travel expenses are deductible under sec. 212. As noted above, had the expenses been incurred in a taxable year beginning after Dec. 31, 1986, sec. 274(h)(7) denies the deduction of the expenses because they were expended for a seminar for sec. 212 purposes. We note that the allocation rules of sec. 274(c) for travel outside the United States do not apply to the trip to London because the trip fits within the exception under sec. 274(c)(2)(A) for travel that does not exceed 1 week.↩
23. For taxes due after Dec. 31, 1981, the specific section which sets forth the addition to tax for negligence is sec. 6653(a)(1). For tax returns due (without regard to extensions) after Dec. 31, 1986, the specific section which sets forth the addition to tax for negligence is sec. 6653(a)(1)(A).↩
24. For taxes due after Dec. 31, 1981, the specific section which sets forth the addition to tax for interest due on the negligent portion of the underpayment is sec. 6653(a)(2). For tax returns due (without regard to extensions) after Dec. 31, 1986, the specific Code section which sets forth the addition to tax for interest due on the negligent portion of the underpayment is sec. 6653(a)(1)(B).↩